Penn Anthracite Mining Co., Appellant, *v.*
Anthracite Miners of Pennsylvania et al.

Argued December 3, 1934. Before FRAZER, C. J., SIMP-
SON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*George Wharton Pepper,* with him *J. A. Montgomery, Jr., Wm. A. Skinner, J. Hayden Oliver* and *John P. Kelly,* for appellant.

*Francis Biddle,* with him *James M. Stack, Samuel H. Torchia, Robert E. Dolphin* and *E. C. Marianelli,* for appellees.

OPINION BY MR. JUSTICE LINN, April 1, 1935:

These appeals are from judgments of the Superior Court reversing the judgments entered in the Common Pleas of Lackawanna County in contempt proceedings. The appeals were allowed for consideration of the contention, made and sustained in the common pleas, that the Act of June 23, 1931, P. L. 925, was unconstitutional in that it conferred the right to a jury trial on one charged with indirect criminal contempt of a restraining order. It appears that, on the application of appellant, the Penn Anthracite Mining Co.; an injunction was granted January 26, 1934, restraining Anthracite Miners of Pennsylvania and members thereof from interfering with the operation of appellant's mines and collieries and from intimidating its employees.

On January 31, 1934, the Penn Anthracite Mining Co. presented its petition in the trial court for a rule to show cause why the appellees here should not be adjudged in contempt of court for violation of the injunction. When

the rule came on for hearing, appellees objected to the proceedings on the ground that by the Act of 1931, supra, they were entitled to be admitted to bail, to be notified of the accusations against them, to be given a reasonable time to make defense and to be granted a jury trial as in the act provided. The court declined to accept that view. Testimony was taken, from which the court made findings of fact establishing that, on January 31, 1934, while appellant's employees were on their way to work at Raymond Colliery in the Borough of Archbald, a large crowd, including appellees, gathered about the automobiles containing the employees and threw stones at them, breaking the windows of the cars and striking and injuring some of the occupants. These acts were intended to, and did, intimidate many of appellant's employees, and prevented them and others from returning to work at the colliery. The appellees were adjudged guilty of contempt and fined $50 each, to be collected by the sheriff, the parties to "stand committed in his [the sheriff's] custody until the order is complied with." The court was of opinion that the power to find the fact of violation of its injunction and to inflict punishment therefor was inherent in the court— a court created by the Constitution—and, therefore, beyond the power of the legislature. The convicted parties appealed to the Superior Court and there contended that the constitutional provision for chancery powers, in the exercise of which the injunction was granted, conferred legislative authority to enact the statute. The Superior Court sustained the contention in an opinion reported in 114 Pa. Superior Ct. 7. The appeal to this court limited consideration to that constitutional question.

The act is as follows: "Section 1. . . . That in all cases where a person shall be charged with indirect criminal contempt for violation of a restraining order or injunction issued by a court or judge or judges thereof, the accused shall enjoy—(a) The rights as to admission to bail that are accorded to persons accused of crime; (b) The right to be notified of the accusation and a reasonable

time to make a defense, provided the alleged contempt is not committed in the immediate view or presence of the court; (c) Upon demand, the right to a speedy and public trial by an impartial jury of the judicial district wherein the contempt shall have been committed, provided that this requirement shall not be construed to apply to contempts committed in the presence of the court or so near thereto as to interfere directly with the administration of justice, or to apply to the misbehavior, misconduct, or disobedience of any officer of the court in respect to the writs, orders, or process of the court; and (d) The right to file with the court a demand for the retirement of the judge sitting in the proceeding, if the contempt arises from an attack upon the character or conduct of such judge, and if the attack occurred otherwise than in open court. Upon the filing of any such demand, the judge shall thereupon proceed no further but another judge shall be designated by the presiding judge of said court. The demand shall be filed prior to the hearing in the contempt proceeding. Section 2. Punishment for a contempt specified in section one may be by fine not exceeding one hundred dollars, or by imprisonment not exceeding fifteen days in the jail of the county where the court is sitting, or both, in the discretion of the court. Where a person is committed to jail for the nonpayment of such a fine, he must be discharged at the expiration of fifteen days, but where he is also committed for a definite time, the fifteen days must be computed from the expiration of the definite time."

It is not disputed that the acts alleged to have constituted the contempt of court occurred ten miles from the courthouse and were, therefore, an indirect contempt; it is likewise undisputed that indictments would lie for the various crimes involved in the acts said to have been committed. The appeal does not, therefore, require us to determine the general scope of the term "indirect criminal contempt" as used in the statute. The provision of the Constitution directly involved is section 20 of article

V, in these words: "The several courts of common pleas, besides the powers herein conferred, shall have and exercise within their respective districts, subject to such changes as may be made by law, such chancery powers as are now vested by law in the several courts of common pleas of this Commonwealth, or as may hereafter be conferred upon them by law."

"That one who asks to have a law declared unconstitutional takes upon himself the burden of proving beyond all doubt that it is so, has been so often declared that the principle has become axiomatic. In Sharpless v. Mayor of Phila., 21 Pa. 147, Mr. Justice BLACK said (page 164) : 'There is another rule which must govern us in cases like this; namely, that we can declare an act of assembly void, only when it violates the Constitution clearly, palpably, plainly; and in such manner as to leave no doubt or hesitation on our minds. This principle is asserted by judges of every grade, both in the federal and in the state courts.' And again in Erie and North-East R. R. Co. v. Casey, 26 Pa. 287, the same Justice said (page 300) : 'The right of the judiciary to declare a statute void, and to arrest its execution, is one which, in the opinion of all courts, is coupled with responsibilities so grave that it is never to be exercised except in very clear cases; one department of the government is bound to presume that another has acted rightly. The party who wishes us to pronounce a law unconstitutional, takes upon himself the burden of proving, beyond all doubt, that it is so.' In Hilbish v. Catherman, 64 Pa. 154, Mr. Justice AGNEW said (page 159) : 'We cannot declare this act unconstitutional unless we can say, in the language of Judge TILGHMAN, that 'its violation of the Constitution is so manifest as to leave no reasonable doubt': Com. v. Smith, 4 Binn. 117.' And Chief Justice SHARSWOOD said, in Com. v. Butler, 99 Pa. 535 (540) : 'To justify a court in pronouncing an act of the legislature unconstitutional and void, either in whole or in part, it must be able to vouch some exception or prohibition clearly expressed or necessarily im-

plied. To doubt is to be resolved in favor of the constitutionality of the act' ": Gottschall v. Campbell, 234 Pa. 347, 363. See also Com. ex rel. Schnader v. Liveright, 308 Pa. 35, 56, 161 A. 697.

The question, therefore, is: May the legislature grant the right to a jury trial to one charged with an "indirect criminal contempt for violation of a restraining order" and limit the punishment? Certainly there is no direct prohibition. The Constitution authorizes the legislature to deal with "chancery powers." What is the meaning of the words as used in the Constitution?

This term has a meaning peculiar to the equity jurisprudence of Pennsylvania, growing out of the peculiar history of equity and its administration in this Commonwealth.[1] By 1873, when the Constitution was adopted, the words had acquired a well understood meaning. Equity has always been part of the law of Pennsylvania (Jordan v. Cooper, 3 S. & R. *564, *578), but it was found that the common law courts could not do justice in particular cases, because they lacked the powers of a court of chancery; that is, they lacked the power to administer the equitable remedies afforded by the English Court of Chancery: Nailer v. Stanley, 10 S. & R. *450, *454; Gratz v. Bayard, 11 S. & R. *41, *48. In the Constitution of 1776, the courts were given "the powers of a court of chancery, so far as relates to the perpetuating of testimony, obtaining evidence from places not within this State, and the care of the persons and estates of those who are *non compos mentis,* and such other powers as may be found necessary by future general assemblies, not inconsistent with this constitution." Additional chancery powers were conferred from time to time, among them, by the Act of March 28, 1786, 2 Sm. L. 375, to supply defects in title occasioned by lost deeds; by the Act of September 28, 1789, 2 Sm. L. 502, to issue interrogatories to

---

[1] See Laussat, Equity in Pennsylvania, reprinted in 1st Ann. Rep. Pa. Bar Assn., 221 et seq.

garnishees. The Constitution of 1790 provided: "And the legislature shall vest in the said courts such other powers to grant relief in equity as shall be found necessary; and may, from time to time, enlarge or diminish those powers." An Act of March 31, 1792, 3 Sm. L. 66, provided for specific performance by personal representatives of deceased vendors of real estate. By the Act of January 19, 1793, 3 Sm. L. 87, the Act of 1789 was made perpetual and extended to the common pleas. An Act of 1798, 3 Sm. L. 303, conferred power to compel the production of books and papers; the Act of February 17, 1814, 6 Sm. L. 104, gave the "power, on the application of the committee, . . . to sell the estate of such lunatic"; the Act of March 22, 1825, 8 Sm. L. 405, gave "the Supreme Court . . . power to grant relief in equity, in all cases of trusts so far as regards the appointment of trustees." Gradually, a long-standing and deep-seated objection[2] to the granting of chancery powers was overcome, and the Act of June 16, 1836, P. L. 784, was passed, though, even then, some of the powers were granted only to the courts of Philadelphia County. This statute, referred to later,

---

[2] "Upon the formation of the new Constitution of 1790, the question of chancery powers, and, indeed, of a separate court of chancery itself, came up for debate. As to this, it need only now be said, that the political events of the past years had impressed upon most of the members of the convention 'a bitter animosity to everything that savored of unusual power,' and the efforts of the lawyers of that body in favor of chancery powers, or of a separate chancery court, failed to succeed. The utmost that was done was that, in place of the concluding clause in the Constitution of 1776 to which I have referred, were inserted the words, 'and the legislature shall vest in the said courts such other powers to grant relief in equity as shall be found necessary, and may, from time to time, enlarge or diminish those powers, *or vest them in other courts,* as they shall judge proper for the administration of justice.' But the power to establish a separate court of chancery thus given to the legislature was not exercised, nor, for nearly half a century afterwards, was any equitable jurisdiction given to the courts then in existence, save in the most parsimonious manner." William Henry Rawle: Equity in Pennsylvania, page 60.

provided that "The Supreme Court, and the several courts of common pleas, shall have the jurisdiction and powers of a court of chancery, so far as relates to . . . [a number of heads of equity jurisdiction]." It is, perhaps, the first time in a general statute relating to chancery powers, that the word "jurisdiction" was associated with the word "powers." [3] The Constitution of 1838 repeated the provision of the Constitution of 1790. Additions followed, until by the Act of February 14, 1857, P. L. 39, the jurisdiction and powers conferred by the Act of 1836 were extended all over the State. Between 1836 and 1927, more than a score of acts were passed conferring additional equity powers. [4] In the light of the history of the development and use of the term "chancery powers," the term therefore comprehends (in the words of MITCHELL, C. J., quoted later in this opinion) *"the jurisdiction, powers, practice and procedure in equity."* [5] (Italics ours.)

---

[3] Cf. Act of March 29, 1824, 8 Sm. L. 286.

[4] June 13, 1840, P. L. 666, section 39; October 13, 1840, P. L. (1841) 1, section 19; April 29, 1844, P. L. 525, section 2; April 16, 1845, P. L. 542, section 3; March 17, 1845, P. L. 158, section 3; April 8, 1846, P. L. 272; April 18, 1848, P. L. 448, section 4; April 25, 1850, P. L. 569; April 8, 1852, P. L. 291; February 14, 1857, P. L. 39; March 14, 1857, P. L. 97; April 15, 1858, P. L. 267; April 5, 1859, P. L. 359; April 6, 1859, P. L. 387 (see, especially, section 3); April 11, 1862, P. L. 477; April 14, 1863, P. L. 374; April 15, 1863, P. L. 499; May 5, 1876, P. L. 123, section 1; March 23, 1877, P. L. 32, section 1; July 7, 1885, P. L. 257, section 1; May 9, 1889, P. L. 172, section 1; May 4, 1893, P. L. 29, section 1; June 7, 1907, P. L. 440, section 2; May 3, 1927, P. L. 515, section 1.

[5] The commissioners on the Civil Code of Pennsylvania in their sixth report, on the Administration of Justice (1835), which resulted in the adoption of the Act of 1836, said (page 15): "It is proper to repeat here, that we consider the whole *theory* of equitable jurisprudence, as already incorporated with our Code, and its principles, as circulating through all the channels of our judicial system. We have adopted them all as fully as they are adopted in any one of our sister states in which a regular chancery court exists, although we have, for the most part, different modes of administering relief."

In decisions of this court, the "chancery powers" have been treated as subject to legislative control. In dealing with the restriction imposed by the Act of July 12, 1842, P. L. 339, abolishing imprisonment for debt, it was said, in Ex rel. Scott v. The Jailer, 1 Grant 237 (1855) : "The acts of assembly conferring chancery powers, carry with them, as a necessary incident to the jurisdiction, the authority to enforce decrees by the ordinary process of attachment, sequestration, etc., *unless that authority be excluded by legislative enactment.*" (Italics ours.) Legislative control was again recognized in Butler Co. v. Ry. Co., 298 Pa. 347, 350, 148 A. 504, where we said: "The powers of equity to enforce a decree, *unless circumscribed by statute or Equity Rules*—rest largely in the discretion of the court, and being clothed with inherent power to control its own process, the court will see that no abuse will be perpetrated." (Italics ours.)    See Hogsett v. Thompson, 258 Pa. 85, 91, 101 A. 941; Wilson v. Blaine, 262 Pa. 367, 371, 105 A. 555.   In Morgan v. Reel, 213 Pa. 81, 62 A. 253, dealing with an act authorizing orphans' court judges "to hear and determine proceedings in equity at the request of the judges of the common pleas,"

_____

(through common law forms; ejectment; Hawn v. Brown, 4 Binney 77; replevin; Weaver v. Lawrence, 1 Dallas *155, *157; large conditional damages; Clyde v. Clyde, 1 Yeates 92; Decamp v. Feay, 5 S. & R. 323). The commission stated (page 29) : "The question then we submit is, not whether adequate authority shall be granted, but in what manner the *powers* which it is shown the courts ought to possess 'to grant relief in equity' should be exercised," and recommended, therefore (page 30), "upon the whole, that it is safest to pursue the same course with respect to the *residuum* of equity *powers*—that is, to give the necessary relief whenever it can be done by the convenient application of some familiar common law remedy, or by the revival of some one that has become obsolete; and whenever full and complete relief cannot be obtained by such process, to resort without hesitation to *the methods of the chancery courts*, and employ them either as we find them, or in a modified shape, as we have done heretofore in useful and harmonious coöperation with those of law." (Italics ours.)

one of the contentions was that the act was in conflict with section 20. MITCHELL, C. J., said (pages 84-5): "Stress was laid in the argument on section 20 of the judiciary article that 'the several courts of common pleas, besides the powers herein conferred, shall have and exercise within their respective districts, subject to such changes as may be made by law, such chancery powers as are now vested by law in the several courts of common pleas of this Commonwealth, or as may hereafter be conferred upon them by law.' But it is not apparent how the act contravenes this section. It takes away no jurisdiction from the common pleas, nor vests any in the orphans' court, and if it did either or both, it would be within the proviso 'subject to such changes as may be made by law.' Indeed, the act may be wholly justified and sustained upon the equity feature of it. Subject to the constitutional guarantee of trial by jury, the *jurisdiction, powers, practice and procedure in equity are inherently matters of legislative control, and are expressly recognized as such in the section quoted of the judiciary article.* It is conceded that the legislature might confer a general jurisdiction in equity, concurrent with the common pleas, upon the orphans' courts." (Italics ours.)

The development of equity jurisprudence in this State, therefore, clearly supports the view that section 20 recognized a reservation of power in the legislature to add to, take from, or otherwise change the chancery powers then, or thereafter, vested in the common pleas, as well as the administration of those chancery powers. When, for example, the legislature conferred power to grant an injunction, such as the record shows was granted in the case out of which this proceeding grew, the legislature at the same time could have regulated the procedure and practice with relation to the injunction and might then have enacted the provisions of the Act of 1931 concerning indirect criminal contempts. The power to punish such criminal violation of the decree is part of the chancery

powers; it is not like an ordinary contempt, as we recognized in Com. ex rel. Lieberum v. Lewis, 253 Pa. 175, 98 A. 31, holding that the Act of 1836 did not apply to violation of the mandatory decree under consideration there.

Appellant in this court suggests that the Superior Court erred in confusing the terms "power" and "jurisdiction." Both words are undoubtedly used properly in many different senses. But we are not convinced that the suggested distinction can be effective in displacing the well recognized and comprehensive character of the meaning of "chancery powers" in the equity jurisprudence of this Commonwealth, as shown by the history outlined above.

There is no basis for the fear, suggested in argument, that the exercise of jurisdiction under such conditional grant will result in loss of respect for the court; the United States District Courts have not suffered in that regard because indirect criminal contempts are triable by jury (Michaelson v. U. S., 266 U. S. 42). A part of the opinion in that case, written by Mr. Justice SUTHERLAND, is pertinent to our discussion: "But it is contended that the statute materially interferes with the inherent power of the courts and is therefore invalid. That the power to punish for contempts is inherent in all courts, has been many times decided and may be regarded as settled law. It is essential to the administration of justice. The courts of the United States, when called into existence and vested with jurisdiction over any subject, at once become possessed of the power. So far as the inferior federal courts are concerned, however, it is not beyond the authority of Congress (Ex parte Robinson, 19 Wall. 505, 510-11; Bessett v. W. B. Conkey Co., 194 U. S. 324, 326); but the attributes which inhere in that power and are inseparable from it can neither be abrogated nor rendered practically inoperative. That it may be regulated within limits not precisely defined may not be doubted. The statute now under review is of the latter character. It is of narrow scope, dealing with the single class where

the act or thing constituting the contempt is also a crime in the ordinary sense. It does not interfere with the power to deal summarily with contempts committed in the presence of the court or so near thereto as to obstruct the administration of justice, and is in express terms carefully limited to the cases of contempt specifically defined. Neither do we think it purports to reach cases of failure or refusal to comply affirmatively with a decree—that is to do something which a decree commands—which may be enforced by coercive means or remedied by purely compensatory relief. If the reach of the statute had extended to the cases which are excluded a different and more serious question would arise. But the simple question presented is, whether Congress may require a trial by jury upon the demand of the accused in an independent proceeding at law for a criminal contempt which is also a crime": Michaelson v. U. S., 266 U. S. 42, 65-6.

We adopt the distinction taken in that quotation as of particular significance in our consideration of the Act of 1931. While the legislature may not abolish the common pleas, it may abolish or change any or all chancery powers conferred on those courts. In short, it may deal with chancery powers to any extent consistent with maintaining the integrity of the courts of common pleas. They do not lose their character as constitutional courts by also exercising the chancery powers granted, or by being limited in the exercise of such powers; they remain courts of common pleas. This Act of 1931 (as Mr. Justice SUTHERLAND said of the Clayton Act, under consideration in the Michaelson case) "does not interfere with the power to deal summarily with contempts committed in the presence of the court or so near thereto as to obstruct the administration of justice, and is in express terms carefully limited to the cases of contempt specifically defined." When legislation touching judicial power not affected by the statute is enacted, a very different question from that now before us will be presented. We think it

cannot be said beyond all doubt that the act is unconstitutional.

The judgments of the Superior Court are affirmed.

CONCURRING OPINION BY MR. JUSTICE MAXEY:

I have no doubt of the constitutionality of the Act of June 23, 1931, P. L. 925. When article V, section 20 of the Constitution says that the chancery *powers* of the courts of common pleas are "subject to such changes as may be made by law," it does not mean (as appellant contends it does) chancery *jurisdiction*, i. e., what fields the courts may act in; it means what the courts may do when they get into the fields assigned them.

Since appellant bases a large part of its argument on the theory that the courts have inherent power to punish *summarily all* kinds of contempts, including an *indirect* contempt, *criminal* in nature as the one was here, I wish to go on record as not subscribing to this doctrine. Appellant makes the novel argument that "the power to punish for contempt . . . is not a 'chancery power,' neither is it a common law power" and it "is not derived from statute." If it is none of these (which run the gamut of judicial powers except, of course, a power *expressly conferred by the Constitution)*, it must be something akin to the divine right of kings, of which Blackstone aptly said (volume IV, 436 [Lewis's ed., page 1792]) : "The claim [in the reign of James I] of a more absolute power inherent in the kingly office than had ever been carried into practice, soon awakened the sleeping lion [the people]. . . . They examined into the divinity of this claim, and found it weakly and fallaciously supported; and common reason assured them that, if it were of human origin, no Constitution could establish it without power of revocation, no precedent could sanctify, no length of time could confirm it. The leaders felt the pulse of the nation, and found they had ability as well as inclination to resist it. . . ." The claim of "inherent power" is always invoked by every governmental agency

which is reaching out for more power, as did King James and Charles the First, and unless the dynamism of this doctrine is restrained, it leads to absolutism. One of the grievances enumerated in the Declaration of Independence was the assumption by the king and parliament of "inherent powers," the language of the declaration being that "He [the king] has combined with others to subject us to a jurisdiction foreign to our Constitution, and unacknowledged by our laws; . . . *and declaring themselves invested with power* [italics supplied] to legislate for us in all cases whatsoever." Protest is then made against the "attempts to extend an unwarrantable jurisdiction over us."

The doctrine that courts of equity "from time immemorial" had the "inherent power" to punish for contempt has been repudiated by modern juristic scholarship. Within the present century it has been demonstrated that the power of English courts of chancery to deal summarily with constructive contempts of court, has not existed *immemorially,* as the advocates of inherency claim, but is the offspring of the oppressive Star Chamber courts, of which courts Blackstone in volume IV, 267 (Lewis's ed., page 1660), says, quoting from Lord CLARENDON, that when they were in existence and functioning, "any disrespect to any acts of state or to the persons of statesmen was in no time more penal, and the foundations of right [were] never more in danger to be destroyed." Sir JOHN CHARLES FOX, late Senior Master of the Supreme Court, English Chancery Division, offers proof in his "History of Contempt of Court," page 4, that "in early times criminal contempt committed by a stranger out of court was proceeded against like any other trespass in the common law courts, with the assistance of a jury, unless the contempt was confessed." Felix Frankfurter and James M. Landis in an article on "The Power to Regulate Contempts," contained in 37 Harvard Law Review 1010, 1046, say: "Until 1720 there is no instance in the common law precedents of punishment otherwise

than after trial in the ordinary course and not by summary process."

The Supreme Court of the United States has recognized the fact that contempts such as we now have before us were punished in the early law of England by the usual criminal procedure, i. e., after trial by jury. In Michaelson v. U. S., 266 U. S. 42, that court said, in discussing contempts within the purview of the Clayton Act of 1914, which provides that wilful disobedience of any lawful writ, etc., of any district court of the United States, etc., if such act or thing be of such character as to constitute also a criminal offense shall be proceeded against upon demand of the accused, by a jury trial: "Contempts of the kind within the terms of the statute partake of the nature of crimes in all essential particulars. 'So truly are they crimes that it seems to be proved that in the early law they were punished only by the usual criminal procedure: 3 Transactions of the Royal Historical Society, N. S., page 147, . . . and that at least in England it seems that they still may be and preferably are tried in that way.' "

That the American people have resented the assumption by certain judges of "inherent power" to proceed summarily against persons for alleged constructve contempt of court is a matter of history. One hundred and five years ago Federal District. Judge PECK imprisoned and disbarred a lawyer for the latter's criticisms of the former's opinion. For this he was impeached. At the trial the defense was that the action complained of was based on common law precedents. Twenty-one senators pronounced the judge guilty and twenty-two not guilty.[1]

---

[1] In his argument in behalf of Judge PECK, William Wirt said: "If the law [relating to constructive contempt] as it stands be disapproved, *it is in the power of Congress to change it.* [Italics supplied.] But they will do this by a legislative act—not by a judicial sentence, as a court of impeachment": Trial of Judge PECK (by Stansbury), page 503.

The next day the House began measures "to define by stattute all offenses which may be punishable as contempts of the courts of the United States and to limit the punishment of the same." The judiciary committee headed by James Buchanan brought in a bill "declarative of the law concerning contempts of court." It passed, and Daniel Webster favorably reported the bill from the judiciary committee of the Senate. It became a law, and forty years later the Supreme Court sustained it (Ex parte Robinson, 19 Wall. [U. S.] 505). Many states copied this law which greatly restricted judicial power over "constructive contempts." See also the cases of Republica v. Passmore (1802), 3 Yeates (Pa.) 441, and Republica v. Oswald (1788), 1 Dallas (Pa.) 318.

Even if British courts possessed 200 years ago the inherent power to punish summarily constructive contempts, that fact would to-day constitute inadequate support for appellant's position. "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV." (Holmes, "The Path of the Law.") It no more follows that Pennsylvania courts possess the power of certain British courts of the 18th Century to punish summarily for constructive contempts than it follows that the chief executive of this Commonwealth possesses all the "inherent powers" of the British 18th Century chief executive. It might as well be argued that because, as Blackstone says (volume I, 246 [Lewis's ed., page 221]), "The king can do no wrong" and "in him is no folly or weakness," the same is true of the successive governors of this Commonwealth. We should not in this time and country accept all claimed judicial power as "inherent" simply because some judges think they *inherit* all the power exercised by the 17th and 18th Centuries English judges, many of whom were animated in their official actions by the same spirit that characterized the arrogant and odious Judge JEFFREYS. The only *"inherent judicial power"* that is entitled to recognition here is that power which is inherent in the sense of being nec-

essarily implied in an express grant of power. Measured by this reasonable standard, the power to adjudge a person guilty of an act of contempt committed away from the court is *not* an implied power necessary to the complete exercise of the judicial power expressly granted. This has been decided by the highest court in the land, for the decision in Michaelson v. United States, supra, supports the proposition that while the power to punish for contempts is "essential to the administration of justice," an act of Congress (the Clayton Act) requiring the court *before proceeding to punish for contempt to submit the question of whether or not a contempt has been committed to the determination of a jury, does not so interfere with the judicial functions of a court as to make the act unconstitutional.* In the light of this opinion the difference between constitutional courts and courts created by statute *is of no materiality in a question of the kind now before us,* for when Congress "ordains and establishes a court" (as the Constitution says Congress may do), it must be a complete court, not one impotent to discharge judicial functions. Appellant claims there is a distinction between courts created by the Constitution and those created by statute. This distinction does not affect in the slightest the validity of the reasoning that *the only kind* of courts the Constitution of the United States authorizes Congress to create are courts capable of adequately discharging judicial functions, and that since the United States Supreme Court has decided that for Congress to pass a law taking away from the statutory federal courts the power to punish for criminal contempt is constitutional, it follows that the highest court in the land does *not* look upon such a law as emasculatory *of any judicial power vital to the discharge of the important duties of the circuit and district courts of the United States.*

Furthermore, the distinction between constitutional courts and statutory courts is very much overdone. What

418

the United States Supreme Court said on this alleged distinction is this: "The power—i. e., to punish for contempt—has been limited and defined by the act of Congress, March 2, 1831, and the act in terms applies to all courts. Whether it can be held to limit the authority of the Supreme Court, which derives its existence and powers from the Constitution, *may perhaps be a matter of doubt* [italics supplied], but that it applies to the circuit and district courts there can be no question": Ex parte Robinson, supra, (19 Wall. 505). In the Michaelson case, the Supreme Court used these words: "The only substantial difference between such a proceeding as we have here, and a criminal prosecution by indictment or information is that in the latter the act complained of is the violation of a law and in the former the violation of a decree. In the case of the latter, the accused has a constitutional right of trial by jury; while in the former he has not. The statutory extension of this constitutional right to a class of contempts which are properly described as 'criminal offenses'. does not, in our opinion, invade the powers of the courts as intended by the Constitution to violate that instrument in any other way." It will be noticed that when Mr. Justice SUTHERLAND used the phrase, "the powers of the courts," he did not say "inferior, or subordinate, or statutory courts."

The most extraordinary doctrine advanced by the appellant is that "the power of a constitutional court to punish for contempt is a sort of judicial police power—a power which the legislature may regulate but cannot destroy, unless it may also destroy the court itself." When any agency of government can find no other justification for its act, it always invokes the so-called "police power" as though the mere repeating of this formula justifies any arbitrary authority assumed. Mr. Justice MILLER in Loan Assn. v. Topeka, 87 U. S. 655, 665, said: "The executive, the legislative, and the judicial branches of these governments are all of limited and defined powers." In Com. v. Vrooman, 164 Pa. 306, 30 A. 217, this

court declared that if a police regulation violates the fundamental law it is void.

What justification is there for the appellant's fear that a jury will not convict the respondents if they are in fact guilty of violence and intimidation? Juries represent the average of the community and if any community falls so low in the scale of civilization as to tolerate violence and mob lawlessness, no one or more judges can save it from the fate its supineness inevitably invites. There is no excuse in this country for any person's expressing his political, economic, or social views through violence, and the worst enemy of labor is the member of a labor organization who counsels violence or who resorts to it. Uncurbed violence means anarchy and the American people will not permit their government to abdicate to anarchy.

Trial by jury is the corner-stone of our administration of justice. Though imperfect, like all other human institutions, it has stood the test of time. Even when chief magistrates of the United States have been assassinated, the responsibility has been placed upon twelve jurors and not upon a single judge to pass upon the guilt of the accused. The Encyclopedia Britannica, 14th ed., volume 14, page 632, says of Magna Carta: "The famous clause promising that no freeman shall be taken or imprisoned or disseised or outlawed or exiled . . . without the judgment of his peers or by the law of the land, was a guarantee of security against arbitrary rule to all men, whether barons or simple free men." This clause is in substance reiterated in section 9 of Pennsylvania's "Declaration of Rights." Blackstone, volume IV, 268, says in regard to certain offenses tried before a court of admiralty without a jury: "As this court proceeded without jury, in a method much conformed to the civil law, the exercise of a criminal jurisdiction there was contrary to the genius of the law of England, inasmuch as a man might be there deprived of his life by the opinion of a single judge, without the judgment of his peers. And besides, . . . innocent persons might thus fall a sacri-

fice to the caprice of a single man. . . ." One of the grievances complained of in the Declaration of Independence was the "depriving us in many cases of the benefits of trial by jury."

In appellant's brief is the following contemptuous reference to trial by jury: "It seems to the appellant to be unthinkable that the vindication of the dignity, authority and prestige of the court should thus be committed to the determination of twelve persons picked up at random." The answer is that for a century and a half the "dignity, authority and prestige" of this and other Commonwealths when menaced by murderers, kidnappers and other felons has been "committed to the determination of twelve persons picked up at random" (i. e., twelve jurors) and has been by such persons amply vindicated. The most eminent statesmen, lawyers, and jurists of America have paid tribute to the jury system. Joseph H. Choate in his address before the American Bar Association on August 18, 1898, said: "It is the best method yet devised for the determination of disputed questions of fact in the administration of justice." In his argument before the United States Supreme Court in Ex parte Milligan, 4 Wall. 2, Jeremiah S. Black said: "It is the best protection for innocence and the surest mode of punishing guilt that has yet been discovered." The Supreme Court of the United States in its decision in that case said: "Milligan was denied a great guarantee of freedom when he was denied a trial by jury. . . . The illustrious men who framed the Constitution were full of wisdom, and they knew that a trial by an established court, assisted by an impartial jury, was the only sure way of protecting the citizen against oppression and wrong." Alexander Hamilton, in the Federalist, No. 58, (Lodge ed.) 521, said: "Arbitrary impeachments, arbitrary methods of prosecuting pretended offenses, and arbitrary punishments upon arbitrary convictions, have ever appeared to me to be the great engines of judicial despotism."

Another fallacy in appellant's argument is that the Act of 1931 takes away from *the court* the right to punish for disobedience to its process. What is taken away is only the right of the *judge* whose order the respondent is accused of disobeying, *to determine unaided by a jury* the fact of disobedience. Appellant might as well say that because a state cannot execute a murderer until a jury pronounces the alleged murderer guilty, the state is deprived of the power to punish murderers. The word "court" and the word "judge" are not synonymous, and to require a judge to share with a jury the administration of justice does not take away power from "a court." Originally the court was the king and when that court spoke, it *was* the sovereign speaking. In this country no single official is sovereign and he can speak *for* the sovereign only so far as the sovereign people have authorized him so to do. In a homicide case, the trial judge *and* the jury constitute the court. "A court is a tribunal organized according to law, . . . not an individual holding a judicial office": People v. Village of Haverstraw, 151 N. Y. 75, 45 N. E. 384, 386.

Appellant in its reply brief declares that the contempt here charged was "a direct defiance of the writ of process of a court" and therefore "the court concededly had the right to issue" process. No one challenges the right of the court to issue process, but what is now challenged is the right of the court after respondents are brought in on its process, to adjudge them *guilty of the contempt charged, without a trial by jury.* For a judge to have the right (1) to grant an injunction, (2) to issue process against those accused of violating it outside the court room,[2] and (3) then to determine the guilt of the accused,

---

[2] Summary proceedings against those who commit contempt *in the face of the court* are based on compelling reasons. A judge while performing his duties has to repress disorder in or near the court room and overcome defiance of his authority by counsel or witnesses, so that the court's business may proceed. He is in the position of an individual who while on a lawful journey finds his pathway un-

makes for speed but speed often makes for injustice. If juries cannot be trusted to render verdicts in cases of criminal contempts, why trust them to render verdicts in the thousands of important criminal and civil cases tried daily in the United States? Alleged disobeyers of a judge's orders are as much entitled to the constitutional right of trial by jury as the alleged violators of state and federal laws.

No human being is ever benign enough to be entrusted with absolute power. Unless we have a jury trial in these contempt cases, *one individual* acts as lawyer, judge, *and* jury. The judge issues the injunction, i. e., "makes the law" for a given situation, then tries him who is accused of its disobedience. What security has a citizen against a judge armed with this unrestrained power to condemn and who perhaps has a prejudice against the man he thinks has been contemptuous toward his command? What respect is the public likely to have for a penalty imposed by a judge on a verdict of guilty rendered by himself as sole juror?[3] In such a case the people instead of

---

lawfully obstructed; he can use appropriate means to overcome aggressions. But when a judge's orders are disobeyed, as here, at a distance from the court room and by criminal acts, these acts become an affront to society and punishment rests with society. Both judges and individuals possess the right of self-defense, but punitive measures after an aggression is completed should not be left with him against whom the aggression was directed.

[3] The advocate who presented the instant appeal to this court, referred on July 8, 1924, to "the growing bitterness of organized labor toward the federal courts. In the senate," he said, "one quickly becomes aware of the existence throughout the country of a sentiment on this subject, which, if unchecked, may easily develop into a revolutionary sentiment. . . . During the past two decades there have been bitter protests from the ranks of labor. To the striker it seems like tyranny to find such vast powers exercised, *not by a jury of one's neighbors but by a single official* [italics supplied] who is not elected but appointed, and that for life, and whose commission comes from a distant and little-understood source": Address of George Wharton Pepper; Reports of American Bar Assn., volume 49, page 174.

upholding the judge usually sympathize with the man sentenced. It is a deep seated human instinct to rebel against arbitrary power. The reign of law depends on public respect for judicial decrees and judgments. Punishment called for by the verdict of an impartial jury, i. e., a tribunal close to the life of the people, commands respect and silences any suggestion that injustice has been done. The influence of the procedure prescribed in the Act of 1931 is a salutary one. Citizens called for jury service in such a case will feel it a duty and an honor to coöperate with the judges of the courts in protecting property, curbing violence, and maintaining the supremacy of the law.

The belief in the capacity of our people for self-government is the genius of the American system and those who mistrust trial by jury apparently have little faith in our form of government. Speaking for the Supreme Court in Gompers v. U. S., 233 U. S. 604, 612, Mr. Justice HOLMES pointed out: "The English courts seem to think it wise, even when there is much seeming reason for the exercise of summary power, to leave the punishment of this class of contempts to the regular and formal criminal process." The best security against the tyranny of arbitrary power is a jury, "technically known as the 'country'" and which is aptly characterized by Sir Henry S. Maine in "Popular Government" (page 90) as "the old adjudicating democracy, limited, modified, and improved, in accordance with the principles suggested by the experience of centuries." Concentration of governmental power is incompatible with a people's freedom. In "The Federalist, No. 47," James Madison said: "The accumulation of all powers, legislative, executive and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."

Appellant's counsel characterize the Act of 1931 as "camouflaging the destruction of judicial power" and as "undermining the injunction," which they describe as

"the only remaining bulwark of public and private safety." This is reminiscent of the rejoinder of those who throughout history when brought to book for reaching out for more power or for some particularly high-handed exercise of the power they had, have attempted to portray themselves as "saviors of the state."[4] It is true now as of old that "power breeds arrogance and arrogance corrupteth the understanding heart." The law which takes away from an *individual judge alone* the power to accuse, try, convict and punish an alleged offender charged with criminal contempt, the charge being based on an act already done, not in the presence of the court, and which requires the judge to submit the question of the defendant's guilt to that "old adjudicating democracy, the jury," is, in my judgment, clearly constitutional.

---

[4] Nine months ago when a European dictator felt it necessary to explain why in a single day he had accused, convicted and done to death, with the merest mockery of a trial, 200 human beings, he declared in a broadcast: "If someone asks me why we did not invoke an ordinary court to deal with these men, I can only tell him: In this hour I was responsible for the fate of the nation, therefore the Supreme Court of the people during these twenty-four hours consisted of myself."