Westinghouse Electric Corporation, Appellant, v. United Electrical, Radio & Machine Workers of America (CIO) Local 601 et al.

Argued March 7, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON and JONES, JJ.

John C. Bane, Jr. and Elder W. Marshall, with them William M. Robinson, Reed, Smith, Shaw & McClay, Paul J. Winschel and Seward French, Jr., for appellant.

David Scribner, with him Sylvan Libson, Henry A. Silver and Hyman Schlesinger, for appellees.

Joseph A. Padway, Welly K. Hopkins and Herbert S. Thatcher, for American Federation of Labor and United Mine Workers of America, amici curiae.

Eugene Cotton, with him Lee Pressman and Frank Donner, for Congress of Industrial Organizations; United Steelworkers of America and United Railroad Workers of America, amici curiae.

*David M. Schlossberg,* for Amalgamated Clothing Workers of America, amicus curiae.

*Isadore Katz,* for Textile Workers Union of America, amicus curiae.

*M. H. Goldstein,* for Industrial Union Marine & Shipbuilding Workers of America, amicus curiae.

*Harry Sacher,* for Transport Workers of America, amicus curiae.

*Harry Weinstock,* for United Furniture Workers of America, amicus curiae.

OPINION BY MR. JUSTICE HORACE STERN, March 12, 1946:

Westinghouse Electric Corporation is engaged in the manufacture of electrical machinery and devices. It has five plants in Allegheny County, the largest being the East Pittsburgh Works; it conducts also a research laboratory. In its manufacturing establishment it employs approximately 16,000 persons engaged in productive labor and plant maintenance; these are represented by the defendant union, the United Electrical, Radio and Machine Workers of America (CIO) Local 601. Another union, Association of Westinghouse Salaried Employees, represents some 200 technicians and clerks employed in the research laboratory and upwards of 6,000 employes in the manufacturing plants,—mostly industrial engineers, draftsmen, salesmen, patent attorneys, cost accountants, clerks and stenographers. There is a third group of about 1,000 employes made up of the Company's executive officers, supervisors and scientists; this latter group is not represented by any labor union.

A dispute arose between the defendant Union and the Company in regard to a demanded wage increase of $2.00 per day. Protracted negotiations to settle the

controversy proved abortive, and a strike began on January 15, 1946. Neither the Association of Westinghouse Salaried Employees nor the third group of employes previously mentioned have any present dispute with the Company and are not on strike. The defendant Union immediately established and has since continuously maintained a picket line at each and every gate of the Company's plants and the research laboratory. The Company filed a bill in equity for a preliminary injunction to restrain the officers and members of the defendant Union from interfering, by mass picketing, violence or intimidation, with employes of the Company engaged in the operation and maintenance of its plants, and from preventing persons, whether employes or others, from entering or leaving its plants and properties. The court below denied the motion for a preliminary injunction and dismissed the bill.

All the testimony, which is extremely voluminous, was presented by plaintiff corporation; defendants offered no evidence and, as none of plaintiff's testimony was contradicted or impeached, there is no dispute on the present record as to the facts; the question for determination is purely one of the proper legal interpretation to be placed upon those facts. Under such circumstances, if the record discloses a fundamental misconception of the controlling law, the ordinary rule that the granting or refusal of a preliminary injunction is within the reasonable discretion of the court of first instance becomes inapplicable: *Casinghead Gas Co. v. Osborn*, 269 Pa. 395, 112 A. 469; *Philadelphia Record Co. v. Curtis-Martin Newspapers, Inc.,* 305 Pa. 372, 378, 157 A. 796, 798.

The cases in which, and the extent to which, courts may issue injunctions in labor disputes are now determined, in this as in many other states and in the nation, by statutory mandate. In Pennsylvania the Labor Anti-Injunction Act of June 2, 1937, P. L. 1198, prescribed that such injunctions should issue only when certain

conditions existed and certain requirements were met; for example, the court must find that the public authorities were unable to furnish adequate protection to the complainant's property; also, the complainant must have made every reasonable effort to settle the labor dispute. Plaintiff admits that in this instance not all the conditions stipulated by that act exist nor have the necessary findings been made by the court, and therefore, if that statute controls, it is not entitled to an injunction; (cf. *DeWilde v. Scranton Building Trades & Construction Council*, 343 Pa. 224, 22 A. 2d 897). Plaintiff relies, however, upon the amendatory Act of June 9, 1939, P. L. 302, which provides that the 1937 act should not apply in any case "Where in the course of a labor dispute . . . an employe, or employes acting in concert, or a labor organization, or the members, officers, agents, or representatives of a labor organization or anyone acting for such organization, seize, hold, damage, or destroy the plant, equipment, machinery, or other property of the employer with the intention of compelling the employer to accede to any demands, conditions, or terms of employment, or for collective bargaining." Plaintiff contends that the acts of defendants, as established by the testimony, amount to a seizure and holding of its plants and properties, that therefore the restrictions imposed by the Act of 1937 do not apply, and that the picketing is illegal and should be enjoined.

What are the facts? None of the officers, agents or members of the defendant Union, except those who are continuing their employment in the plants in order to protect and maintain them, has actually entered any of the Company's properties or laid a hand upon any equipment, machinery or other property therein contained. There has been no "sit-down" strike in the sense that any members of the Union have barricaded themselves within any of the plaintiff's buildings or established themselves there in possession and occupation. But, when the strike was in contemplation and before

it had actually started, a number of meetings were held between officers of the defendant Union and representatives of the plaintiff corporation in the course of which the former requested the latter to prepare a list of persons who might be deemed necessary to protect the Company's plants, defendants being willing, because of their interests as well as that of the Company, to safeguard the physical maintenance of the machinery and equipment. However, as an official of the Company who was present at these meetings testified, they "made it quite clear that anyone not agreed to on the list would not get admittance through the picket line . . . they would not be admitted to the plant unless their name was on a list in the Union office." And, as another such official testified: "In reference to the lists we were informed that they would have to be the very minimum number of employes to have consideration by the Union, that it was to include no person who would pursue any productive work, that it had to do only with plant protection." In response to a question as to how defendants intended to conduct the strike and whether they intended to let into the plant those people who were not on strike "their reply was to the effect that people would be permitted to enter, but only on passes issued by the Union. . . . They stated it was their intention to permit nobody to enter the plant except those who had passes issued by the Union, and that it was their intention to picket the plant 24 hours a day". A list was prepared by the Company which was carefully examined by the Union and a large number of the names rejected by it; it approved about 300 in number, two-thirds of whom belonged to its membership, and it issued passes on a weekly basis to those persons; later, when the case came on for hearing before the court, defendants agreed to add to the list 71 other names of employes who were not members of the Union and who, it was agreed, could be admitted on identification cards of the Company; still later, during the course of the hearings, an addi-

tional 48 names were added to those of the persons whom the Union would permit to enter the plants.

The consent of the Union thus given to the admission of the persons listed naturally carried with it, as an implied corollary, that it would deny the right of entrance to all others; indeed, as appears from the testimony previously quoted, it was so expressly stated by the officers of the Union, and, in a letter written by its acting President to an official of the Company shortly before the strike began, it was again explicitly declared that "only the passes issued by our Strike Committee will secure any recognition from the pickets." This avowed policy of the Union was not merely academic or ideological, but was implemented by positive action in all the instances when it was put to the test. Thus, W. C. Rowland, manager of one of the divisions of the East Pittsburgh Works, testified that when he sought admittance to that plant a "captain" of the pickets told him that "if I wanted to get in I would have to get a pass from the Union". He then tried other entrances, but always the same statement was made to him and he was refused admittance.[1] John Wood, a foreman or supervisor, testified that he was denied admittance to this same plant by those picketing the entrance gates; a "lieutenant" of the pickets "produced a list . . . and found that we weren't on it, and he said 'Well, your name isn't on the list', and we said 'What does that mean? Does that mean we don't get in?' and he said 'You'll have to go to the Union office for a pass' ". The same thing happened again later, this time both a "captain" and a "lieutenant" of the pickets telling him that he "would have to go to the Union office and receive a. pass from the Union", and that otherwise the pickets would not allow him to enter. He also testified that a nurse from the Company's medical department was likewise refused admittance because she did not have a Union pass. Another witness, G. M. Crawford, a patent

---

[1] The Union subsequently agreed to place the name of this witness on the list of those entitled to admission.

attorney employed by the company, testified that he was barred from entering the plant, the pickets saying that his name was not on the list and "they were under orders to admit no one except those on this list". August Mayer, a maintenance supervisor, testified that a "captain" and a "lieutenant" refused him admittance; the "captain", after looking at his list, said: "You aren't on my list, so you can't get in;" on another occasion this same experience was repeated, the "lieutenant" stating, after looking at his list: "I'm sorry, boys, your name isn't on the list, you can't get in . . . Go to union headquarters and get a pass if you insist on going in." M. Hetenyi, a research engineer, and Dr. Joseph Slepian, an associate director of research, both testified that they were denied admission to the research laboratory because a Union pass was demanded of them and they did not have any. J. A. Hutcheson, also an associate director in the research laboratory, and John F. Hooper, a staff supervisor, testified to a similar demand by the pickets, with the same unfavorable result.[2]

Plaintiff produced in all 21 witnesses who testified that they were employed by the company and that, on various occasions from the time of the beginning of the strike to the time of the hearings, they were not allowed access, by the pickets on guard, to the East Pittsburgh plant, or to the research laboratory, or to the plaintiff's Nuttal works, or to a building leased by the Company at 601 South Avenue, Wilkinsburg. During the early days of the strike the number of pickets in the line at each entrance varied from as few as 8 or 10 to as many as 50, 75, 100 or even 150; later, by the time of the hearings the number had been substantially reduced, but was always apparently subject to augmentation if those forbidden to enter attempted to do so. The pickets walked closely behind one another at each gate in a compact circle or elliptical formation and so near to the entrance

---

[2] These two witnesses were later added to the list of those permitted by the Union to enter.

that it would have been impossible for anybody to edge in without running the gantlet thus established. In some instances employes seeking to enter were prevented from so doing by force and violence, in others, those who were more cautious resigned themselves to the inevitable and —reluctant to engage in a scuffle that might possibly lead to bloodshed—departed in peace. Without attempting to reproduce the great mass of testimony in detail it is sufficient to say that its cumulative effect is to establish beyond any doubt that the pickets of the defendant Union never intended to let any person enter any of the Company's properties without their consent and that they enforced that intention and that policy by means of persuasion when such methods were sufficient, but also, when necessary, by intimidation and threatened violence. That there were thousands of employes ready to work is demonstrated by a letter which was offered in evidence,[3] written, when the strike first started, by the President of the Association of Westinghouse Salaried Employees to an official of the plaintiff corporation, in which it was stated that they (the members of the Association) were willing and wanted to work and would report for that purpose unless forcibly prevented from doing so.

The question then arises: Do the facts thus established indicate a seizure and holding of the Company's property by defendants within the meaning of those terms in the Act of 1939? We answer that question unhesitatingly in the affirmative. Defendants argue that at the time of the enactment of the 1939 amendment there had arisen an occasional practice on the part of strikers of taking possession of the employer's factory by physical entry and occupation—the so-called "sit-down" strikes,—and that it was that kind of seizure and holding that the framers of the amendment had in contemplation. But, while the technique employed

---

[3] The offer was overruled and the letter rejected, but in our opinion improperly.

in such strikes may have changed, it is obvious that the seizure of a plant may, from a realistic standpoint, be effected in ways other than by actual entry into the building itself. It certainly is not necessary in order to constitute a seizure and holding that each and every brick and stone, each and every room and floor, be physically grasped and possessed. If the owner be deprived of the use and enjoyment of the property so that it becomes utterly valueless to him it is effectively seized and held whether the force employed for that purpose be exerted within the building or immediately without. The control of the entrances is the control of the plant. Surely defendants would not deny that, if 5, 10, 50 or 100 of their members stood directly *within* the gates and prevented the owners and their employes from entering, this would constitute a seizure of the property within the ordinary meaning of that word, and how is it less a seizure and a holding if the same number of persons, for the same purpose and with the same effect, stand immediately in front of the gates instead of behind them? Would defendants deny that, if they locked and bolted all the entrance doors and thereby prevented ingress and egress, such action would constitute a seizure and holding of the plant within the normal connotation of those terms and therefore within the meaning of the statute? But what difference is there between such a method of seizure and that of holding the gateways closed, not by mechanical devices, but by a chain of human beings stretched across those gateways and thereby even the more effectively preventing access to the property and its use by the rightful owner? And even if it were technically to be held that the force which accomplishes the seizure must be applied on the very premises of the employer, that technicality is satisfied when the pickets operate from positions in front of the gates, because ordinarily the title to property abutting on a public highway extends to the center of the highway, the sidewalk being for all intents and pur-

poses a part of the owner's premises subject only to the public's easement of passage: *Duquesne Light Co. v. Duff,* 251 Pa. 607, 97 A. 82; *Scranton v. Peoples Coal Co.,* 256 Pa. 332, 335, 100 A. 818, 819; *Breinig v. Allegheny County,* 332 Pa. 474, 477, 478, 2 A. 2d 842, 845, 846; *Hindin v. Samuel, Mayor,* 158 Pa. Superior Ct. 539, 542, 45 A. 2d 370, 372.

For the reasons thus stated we reiterate what was said by Mr Chief Justice MAXEY in *Carnegie-Illinois Steel Corporation v. United Steel Workers of America,* 353 Pa. 420, 429, 45 A. 2d 857, 861, that "Forcibly to deny an owner of property or his agents and employes access to that property . . . is in practical and legal effect a seizure or holding of that property." We do not mean to be understood as ruling that any particular number of isolated instances of the application of force, violence or intimidation to prevent persons from entering an employer's plant or factory necessarily amounts in legal effect to a seizure and holding of the property. But when, as here, such occurrences are for the purpose of implementing an expressly declared intent or policy to prevent such ingress and egress there is a seizure and holding within the meaning of the Act of 1939.

Freed from the restrictions imposed by the Labor Anti-Injunction Act there is no doubt that plaintiff is entitled to an injunction in this case. The Court is not unmindful of, and certainly not unsympathetic with, the trend which has developed in connection with the issuance of injunctions in labor disputes from the days when even peaceful picketing was enjoined [4] to the present time when the Norris-LaGuardia Act and the Pennsylvania statute have declared current public policy

----

[4] *Murdock, Kerr & Co. v. Walker,* 152 Pa. 595, 25 A. 492; *Wick China Co. v. Brown,* 164 Pa. 449, 30 A. 261; *O'Neil v. Behanna,* 182 Pa. 236, 37 A. 843; *Jefferson and Indiana Coal Co. v. Marks,* 287 Pa. 171, 134 A. 430; *American Steel Foundries v. Tri-City Central Trades Council,* 257 U. S. 184.

with respect to that subject. We said in the *Carnegie-Illinois Steel Corporation* case, supra, (pp. 430, 431, 45 A. 2d 857, 861) : "Injunctions are not issued against picketing when the latter's only purposes are to advertise the fact that there is a strike in a certain plant and to persuade workers to join in that strike and to urge the public not to patronize the employer". We have so held since the decision in *Kirmse v. Adler,* 311 Pa. 78, 166 A. 566. The right of picketing, when free from coercion, intimidation and violence,[5] is a right constitutionally guaranteed as one of free speech: *Senn v. Tile Layers Protective Union,* 301 U. S. 468, 478; *Thornhill v. Alabama,* 310 U. S. 88; *American Federation of Labor v. Swing,* 312 U. S. 321; *Cafeteria Employees Union, Local 302 v. Angelos,* 320 U. S. 293. But picketing to the extent to which it is designed to seize and in effect does seize and hold the employer's plant by the methods here employed does not fall within either constitutional, statutory, common law or equitable protection.

Plaintiff produced convincing evidence of irreparable damage, not because of any destruction of, or injury to, its plants, but because of the interruption of vital activities necessary by way of preparation for future business and production.

The order of the court below is reversed, and the record remanded with direction to issue an injunction enjoining and restraining defendant Union, its officers, representatives, agents and members and all other persons acting in concert with them (1) from preventing or attempting to prevent, by mass picketing, violence, intimidation or coercion, any person or persons from entering or leaving plaintiff's plants and properties and (2) from in any other manner seizing or holding

---

[5] *Kirmse v. Adler*, 311 Pa. 78, 83, 88, 166 A. 566, 568, 570; *Milk Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies, Inc.,* 312 U. S. 287; cf. *Cafeteria Employees Union, Local 302 v. Angelos,* 320 U. S. 293, 296.

said plants and properties. Said injunction to be effective upon the filing of plaintiff's bond in the sum of $10,000, with surety approved by the court, in manner and form required by law, and to continue until final hearing. Each party to bear its own costs.

CONCURRING OPINION BY MR. CHIEF JUSTICE MAXEY, March 13, 1946:

I concur in the majority opinion. There never was a time in the history of American jurisprudence when the right of a court of equity to issue an injunction to protect a citizen's property from imminent irreparable injury was not recognized by the courts and sustained by public opinion. No political party (except the Communist party) has in its platform ever challenged such a right. The protection of a citizen in the free enjoyment of his life, his liberty and his property was guaranteed by the 29th chapter of Magna Charta and is a principle of protection embodied in the federal constitution and in the constitutions of every one of the forty-eight states of the Federal Union.

The Act of June 2, 1937, P. L. 1198, 43 P. S. 206 a, b, c, was a complete departure from the equity procedure established in this Commonwealth in 1836 and followed for 101 years, and this departure was promptly rectified by the Act of June 9, 1939, P. L. 302, 43 P. S. 206 d. None of the three legislatures which have met since that rectification was effected have manifested any desire to undo it. Even the Act of 1937 in specifying the acts which could not be enjoined, was careful *not to countenance the use of violence* or any other kind of *un*peaceable methods to attain the ends for which employees went on a strike. For example, Sec. 6 of the Act declares that "no court . . . shall have . . . power in any case involving a labor dispute to issue any restraining order or temporary or permanent injunction which . . . restrains . . . any person . . . from doing, whether singly or in concert with others . . . any of the following

acts: (a) . . . (b) . . . (c) . . . (d) . . . (e) . . . (f) . . . (g) . . . (h) . . . (i) . . . (j) Assembling *peaceably* to do, or to organize to do, any of the acts heretofore specified, or to promote their lawful interests. (k) . . . (l) . . . (m) Advising, urging or otherwise causing or inducing, without misrepresentation, fraud or *violence,* others to do or not to do the acts heretofore specified;" (italics supplied).

Even in its declaration of "public policy", the Act of 1937 did not condemn all *issuance* of injunctions in cases involving labor disputes. It declared in Sec. 1 (b) that an "equity procedure that permits a complaining party to obtain a sweeping injunctive relief that is not preceded by or conditioned upon notice to and hearing of the responding party or parties or that permits sweeping injunctions to issue after hearing based upon written affidavits alone and not wholly or in part upon examination, confrontation and cross-examination of witnesses in open court is peculiarly subject to abuse in labor litigation for the reasons that", specifying four reasons that do not apply to the present case and which did not apply in the case of *Carnegie-Illinois Steel v. United Steel Workers of America,* 353 Pa. 420, as is pointed out on page 435 of *that* opinion.

The injunction which we have ordered issued in the instant case does not interfere with peaceful picketing or with any other lawful act. It does prohibit the "defendant Union, its officers, representatives, agents and members and all other persons acting in concert with them (1) from preventing or attempting to prevent, by mass picketing, violence, intimidation or coercion, any person or persons from entering or leaving plaintiff's plants and properties and (2) from in any other manner seizing or holding said plants and properties." It is impossible to understand how any law-respecting person can object to the issuance of a restraining order against such palpably inexcusable and lawless acts as the decree we have ordered is directed against. No *lawful* activity

of strikers or of others is curbed by such a decree. When any government becomes so impotent that it cannot, by acting through its courts, summarily prohibit such lawless acts as those above specified, it is recreant to the purposes of its creation. When a government permits an individual or a group of individuals to contemn its laws and deprive law-abiding individuals of their rights to either life or liberty or property, it is abjectly surrendering to anarchy.

Nothing can be found in Justice BRANDEIS' dissenting opinion in *Truax v. Corrigan,*[1] 257 U. S. 312, 367, 8, which (1) gives the slightest sanction to picketing which is *coercive* in character, or (2) gives the slightest sanction to any restriction on the power of a court of equity to restrain actual or threatened injury by violence directed against another's property. Justice BRANDEIS says in his opinion (p. 363) : "Courts were required, in the absence of legislation, to determine what the public welfare demanded;—whether it would not be best subserved by leaving the contestants free to resort to any means *not involving a breach of the peace or injury to tangible property."* (Italics supplied). Justice BRANDEIS, in reviewing the questions which had been decided by the Supreme Court of Arizona in the case *then* before the Supreme Court of the United States said that the Supreme Court of Arizona "made its decision on four controverted points of law". After briefly referring to the first three of these "points", which have no bearing on the instant case, he said: "The fourth question requiring decision was whether peaceful picketing should be deemed legal. Here, too, each of the opposing views had the support of decisions of strong courts." *Un*peaceful picketing obviously had the support of decisions of *no* court.

The law of Arizona which Justice BRANDEIS declared he would *uphold,* was a law which, as he points out,

---

[1] Referred to in the dissenting opinion in the instant case.

"contains among other things, a prohibition against interfering by injunction between employers and employees, in any case growing out of a dispute concerning terms or conditions of employment, *unless interposition by injunction is necessary to protect property from injury through violence.*" (Italics supplied.)

In the instant case, it was not necessary for the plaintiff to show "that property damage" in the sense of property physically destroyed "was actually threatened or done". To keep defendants' representatives out of the plaintiff's plant by a show of force as was done in the instant case by defendants' agents, (for example, by a "captain of pickets" and others) was an assumption of dominion over another person's property and was, in legal effect, a lawless seizure of that property. It was as much a lawless seizure of another's property as would a striking chauffeur's forcible refusal to let his employer or the latter's family enter the employer's automobile. That the defendants claimed the right to control ingress to plaintiff's plant and maintained that claim by hostile force, is completely proved. It was shown that at one gate "a chain of thirty or forty pickets was marching in a circle" directly in front of it. They excluded from the plant the Director of the Laboratory, and many other laboratory officials and employes. At another gate, 13 pickets and two of their "officers" blocked ingress. As another laboratory official attempted to enter the gate, the "captain of pickets" said to him: "You aren't on our list so you can't get it . . . The boys in the picket line will keep you out . . . Are you looking for trouble?" But even if the number of pickets "amounted to not more than a corporal's guard" (as has been asserted) *that* would be wholly immaterial to the issue before us. If there was only *one* picket and if he succeeded in blocking ingress to the plant by a display of force, his act would be lawless and enjoinable. There is no act of violence against persons or property which should be beneath the notice of the organized agencies of govern-

ment.[2] The supremacy of law is maintained by governmental agencies promptly operating against lawlessness wherever and whenever lawlessness attempts to act.

If the owners of property are to be deprived by law-defying crowds [3] of the immemorial incidents of private ownership, such as the right of ingress and egress, and control and management, "the right of private ownership" [4] will be a "right" devoid of substance. By the defendants' denial to plaintiff's employees of access to plaintiff's property, as was shown in this case, there was satisfactorily proved a loss to the plaintiff of $50,000 a day. That is one kind of loss of property which courts of equity are established to guard against. For the courts or other agencies of government to permit a citizen to be deprived of his property "even in a single in-

---

[2] A certain President of the United States who occupied that office in 1894 was acclaimed by his contemporaries and is acclaimed by history for declaring in a time of threatened forcible stoppage of mails by strike violence that "if it takes the entire Army of the United States to deliver one postal card in Chicago, *that card will be delivered*."

[3] Today crowds are "determined to utterly destroy society as it now exists with a view to making it hark back to that primitive communism which was the normal condition of all human society before the dawn of civilization . . . The nationalization of mines, railways, factories and the soil . . . such are these claims." "The Crowd," by Gustav LeBon, p. 16.

[4] The institution of private ownership of property is a necessary concomitant of a free society. Property is a by-product of work in a free society. A slave owns no property; a slave *is* property. There is not now and never has been a socialistic or communistic democracy or a socialistic or communistic republic, for a socialistic or communistic state can function only under a dictatorship. Such a state must (and always does) assume total control over all human activities in order to carry out its mandate to communize all property, satisfy all wants and establish the millenium. The organization essential to the functioning of a socialistic or a communistic state is utterly incompatible with the organization of either a democracy or a republic. Nations which remain free are those whose governments function under constitutional restraints and whose citizens respect the disciplines of the law.

stance" strikes at the foundations of orderly society. When the legislature of this state attempted to deprive legitimate children of a part of their inheritance and vest that part in an illegitimate child, this court in *Norman v. Heist*, 5 W. & S. 171, speaking through Chief Justice GIBSON, said: (p. 173) "The right of property has no foundation or security but the law; and when the Legislature shall successfully attempt to overturn it, even in a single instance, the liberty of the citizen will be no more."

The right of peaceful picketing has long been recognized in this Commonwealth. The right to seize another's property or to deny an owner of property or his representatives and employees access to that property has never been recognized in this Commonwealth or in this nation. In no opinion filed by any member of the United States Supreme Court in the case of *Truax v. Corrigan*, supra, is there a single expression condemning the issuance of injunctions to prevent irreparable damage to property when such damage is threatened. The Supreme Court of the United States was as recently as 1939, in the case of *Labor Board v. Fansteel Corp.*, 306 U. S. 240, unanimous [5] in its condemnation of the seizure and retention of an employer's property by a "sit-down strike". In the latter case Chief Justice HUGHES, speaking for the Supreme Court, said: "The employees had the right to strike but they had no license to commit acts of violence or to seize their employer's plant. We may put on one side the contested questions as to the circumstances and extent of injury to the plant and its contents in the efforts of the men to resist eviction. The seizure and holding of the buildings was itself

---

[5] In the case just cited Justice REED filed an opinion "dissenting in part" and Justice BLACK noted his concurrence in the "partial dissent". Justice REED did not dissent from the court's condemnation of the forcible seizure and retention of an employer's factory buildings. He declared, in substance, that he found in the "Labor Act" of 1935 "no protection for unlawful activity."

a wrong apart from any acts of sabotage. But in its legal aspect the ousting of the owner from lawful possession is not essentially different from an assault upon the officers of an employing company, or the seizure and conversion of its goods, or the despoiling of its property or other unlawful acts in order to force compliance with demands. To justify such conduct because of the existence of a labor dispute or of an unfair labor practice would be to put a premium on resort to force instead of legal remedies and to subvert the principles of law and order which lie at the foundations of society."

The opinion of the majority of this Court in the instant case is in complete accord with the opinion of the United States Supreme Court in the case just cited, and with the opinions of *this* Court in every case in which the question now decided or any other question resembling it has been before it since the courts of this Commonwealth have had the jurisdiction and powers of a Court of Chancery.

---

DISSENTING OPINION BY MR. JUSTICE JONES, March 12, 1946:

It is agreed on all sides that if the procedural restrictions of the Act of 1937 as amended are applicable to this case, the complainant is not entitled to an injunction. Counsel for the complainant freely so conceded both in their brief and in their oral argument at bar. That those restrictions are applicable continues to be my opinion as heretofore expressed: *Carnegie-Illinois Steel Corp. v. United Steelworkers of America,* 353 Pa. 420, 436, 45 A. 2d 857.

The question as to the impact of the 1939 amendment upon the Labor Anti-Injunction Act of 1937 is simply one of statutory construction. It is inconceivable to me that the legislature intended in the 1939 amendment to cast out entirely, with one fell swoop, the public policy as declared and effectuated by the Act of 1937. Yet, such is the result which this Court imputes to the

1939 amendment. Henceforth, it can be only a lawyer of less than average skill who will not be able to draw injunction affidavits that may be fitted to one or more of the situations described in the four lettered paragraphs of the 1939 amendment. And, so, the procedural requirements of the 1937 Act may now be obviated at any time in any case involving or growing out of a labor dispute.

The public policy declared and sought to be carried out by the Act of 1937 was not a matter of recent development. It represented a considered and matured opinion, produced by the debates, discussions and writings of scholars and public men, including many eminent lawyers, over almost a half-century on the question of the evils of "government by injunction" in labor disputes. Within three years of the granting of the first injunction in a labor case by a federal court, a bill was introduced in Congress (1894) to restrict the equity jurisdiction of federal courts in limitation of their power to grant such injunctions and, from then on, the subject was bruited perennially. It merited a place in a National Party platform in a presidential campaign as early as 1896. The arguments in favor of the limitation of equity's jurisdiction in such regard were well summarized by Mr. Justice BRANDEIS in 1921 in his dissenting opinion (wherein Mr. Justice HOLMES joined) in *Truax v. Corrigan,* 257 U. S. 312, as follows at pp. 367-368,—"It was asserted that in these proceedings [for injunctions in labor disputes] an alleged danger to property, always incidental and at times insignificant, was often laid hold of to enable the penalties of the criminal law to be enforced expeditiously without that protection to the liberty of the individual which the Bill of Rights was designed to afford; that through such proceedings a single judge often usurped the functions not only of the jury but of the police department; that, in prescribing the conditions under which strikes were permissible and how they might be carried out, he usurped also the

powers of the legislature; and that incidentally he abridged the constitutional rights of individuals to free speech, to a free press and to peaceful assembly.

"It was urged that the real motive in seeking the injunction was not ordinarily to prevent property from being injured nor to protect the owner in its use, but to endow property with active, militant power which would make it dominant over men. In other words, that, under the guise of protecting property rights, the employer was seeking sovereign power. And many disinterested men, solicitous only for the public welfare, believed that the law of property was not appropriate for dealing with the forces beneath social unrest; that in this vast struggle it was unwise to throw the power of the State on one side or the other according to principles deduced from that law; that the problem of the control and conduct of industry demanded a solution of its own; and that, pending the ascertainment of new principles to govern industry, it was wiser for the state not to interfere in industrial struggles by the issuance of an injunction." (Footnote omitted.)

The instant case affords an interesting commentary on the arguments against the use of injunctions in labor disputes as listed by Mr. Justice BRANDEIS. The court below found, and I believe the evidence supports the finding, that no property damage was actually threatened or done; that no violence occurred in the sense that any physical injury was inflicted on any one at any time although sixteen thousand workmen were on strike; and, that, except for the first several days of the strike, the pickets amounted to no more than a corporal's guard. In the one instance in which police aid and protection was availed of at the complainant's rented building at 601 South Avenue, Wilkinsburg, the picket line permitted nonstriking workmen to enter the employer's property without molestation, according to the complainant's witnesses. Nor am I able to find in the record any competent proof that "there were thousands of employees

ready to work". The letter which the majority opinion says so demonstrates was, in my opinion, very properly excluded by the trial judge. It was patent hearsay.[1] Yet, an injunction issues although the complainant neither averred nor offered a word of proof to support a finding, prerequisite to the granting of an injunction in such a case as required by the amended Act of 1937, "That the public officers charged with the duty to protect complainant's property are unable to furnish adequate protection." For the importance of such an averment and finding in fulfillment of the public policy legislatively declared, see opinion of Judge HUTCHESON in *Carter v. Herrin Motor Freight Lines, Inc.,* 131 F. 2d 557 (C. C. A. 5), at p. 561.

I should affirm the decree of the court below.

---

[1] The letter was from the President of the Association of Westinghouse Salaried Employees (another union of complainant's employees not on strike) and was addressed to the complainant's manager of its Industrial Relations Department. It accepted the conditions of the complainant's offer "to pay all members" of AWSE and stated that at a meeting of the Executive Committee of AWSE, it had been decided that the members of that union would work "unless forcibly prevented from doing so." Realistically, the letter neither gave, nor in the nature of things could have given, any assurance that a single one of the members of AWSE would cross the most attenuated and peaceful of picket lines at any time. The respect which a member of organized labor pays to a picket line, even one not of his union, may well be "judicially noticed". There is also evidence in the record that the members of the defendant union had refrained from crossing AWSE's picket lines when that union's members were out on strike at a former time.