# Westinghouse Electric Corp. v. Local 617, International Union of Electrical, Radio and Machine Workers (CIO)

328

*Fruit & Francis* and *William A. Dill,* for plaintiff. *Benjamin H. Marks,* for defendant.

RODGERS, P. J., October 28, 1955.—The matter before this court is the petition of the Westinghouse Electric Corporation. for a temporary injunction based on an allegation that the act of defendants amount to a seizure of their plant.

In deciding this problem this court is bound by two basic, unquestioned legal principles:

First, the right of the American working man to peaceful legal picketing. Our Supreme Court has said:

"The right of picketing when free from coercion and intimidation is a right constitutionally guaranteed as one of free speech."

Second, the right of a property owner to access to his property. Our Supreme Court has also said:

"Forcibly to deny an owner of property or his agents and employes access to that property is in practical and legal effect a seizure or holding of that property."

As we said, these principles are not now open to question. Enlightened management has not only recognized the right of labor to strike but has taken steps to assure that men on strike would be treated with respect due an American citizen exercising a proper legal right.

It is also true that the reasonable leaders of labor have never condoned nonlegal acts to promote a strike.

Samuel Gompers, one of the earliest leaders of American Labor, 45 years ago said: "I would never consciously urge a violation of the law."

John Mitchell of the Mine Workers in 1903, writing in his book on organized labor, in the chapter called, "The Proper Conduct of a Strike", said:

"Above all and beyond all the leader entrusted with the conduct of a strike must be alert and vigilant in the prevention of violence. The strikers must be made constantly aware of the imperative necessity of remaining peaceable."

The American Civil Liberties Union and the Supreme Court of Pennsylvania has said:

"The right to picket never justifies the use of force to prevent access to plants on strike by those who are willing to cross picket lines."

This, my friends, is basic American law.

Without attempting to reproduce the testimony in detail, it is sufficient to say that its cumulative effect is to establish beyond doubt that in reality defendant at this time does not intend to let any person enter the company property without the union's consent.

It is also clear that the pickets have used and intend to use whatever forces or numbers are necessary to prevent such entry.

We feel bound to state that the compromise suggestion of the court made last Thursday to avoid this impasse was a workable one. However, a limited number of the sales representatives of plaintiff, acting, as far as the record shows, on their own initiative, began the removal of records and equipment from plaintiff's property after arrangements had been made to secure admission of the company's supervising personnel to the property. This, of course, was within the company's legal rights, but did not conform with the spirit of the suggestion made by the court, and in our opinion, led directly to a decision on the part of the union to again deny to the company free access to their property. This, of course, the union, even under these circumstances, had no legal right to do, and the Supreme

Court has clearly set out that an injunction should be granted in such cases.

This court, however, is of the opinion that an injunction is an extraordinary remedy and should be used only where the regular law enforcement agency, that is the police, cannot give plaintiff the necessary relief.

Therefore, no testimony having been produced by plaintiff concerning the use of local authorities by them to gain access to their property, on the court's instruction, the Chief of Police of Sharon was called. He testified that he had not been requested to provide access to the plant. He also testified, however, that in his opinion an attempt on the part of his men to provide access to the property would lead to physical opposition and possible violence. We believe that at this stage we must accept his opinion as to this probable result.

The court might, however, even under these circumstances turn this matter over to the local police and take a chance on the results. We do not believe, however, that this would be meeting the problem. We do not want any headcracking in this matter. That belongs to a different era. The court, therefore, makes the following findings of fact.

### Findings of Fact

1. That defendant has denied plaintiff the right to access to its property by the use of force or the threat of force.

2. That there have been isolated instances of the use of force by employes of plaintiff.

3. That the local police cannot provide the necessary relief without undue risk of violence.

We, therefore, propose to file the following restraining order.

### Order

And now, to wit, October 28, 1955, plaintiff having presented its bill of complaint seeking a temporary

restraining order against defendant, and it appearing to the court after hearing in open court and parties present represented by counsel, that irreparable loss or damage will result to plaintiff,

It is ordered, adjudged and decreed that a temporary restraining order do now issue strictly enjoining and restraining defendants, Local 617 of the International Union of Electrical, Radio and Machine Workers (CIO), a voluntary association, and Eugene Dyll, John Lysohir, Henry Gunesch, Joseph Fragle, Albert Bell, as well as all other persons acting in concert with them or in their behalf *from:*

1. In any manner unlawfully impeding, obstructing, hampering or interfering with the business of said plaintiff.

2. Preventing or attempting to prevent by any species of intimidation, threat, force or coercion or by turning aside any of plaintiff's agents, employes, representatives, customers and others having business with said plaintiff from entering, leaving and transacting business at plaintiff's Sharon works in the City of Sharon and in Pymatuning Township of Mercer County.

3. Picketing other than peacefully and from unlawfully interfering with the ingress to or egress from the said Sharon works in Sharon and the Pymatuning Township works in Mercer County, of plaintiff, including the unloading and dispatch of merchandise to and from the same.

4. If defendants or any of them shall choose to picket or remain near any entrance to the property of plaintiff, such pickets shall refrain from mass picketing or in any other manner interfering with persons using the entrances or exits and shall conduct themselves in such manner as not to block the use of the said entrances or ingress or egress of any party desiring to enter the same.

5. Plaintiff and its representatives and defendants and their representatives shall refrain from any act of violence or intimidation. Bond in the amount of $10,000 to be filed by plaintiff and approved by the court.

We understand that the plant is not ordinarily open on Saturday and Sunday. Therefore, in order that both the union and the company may have the opportunity to inform their members, employes or representatives of the content, meaning and spirit of the court's directive, the order will become effective at 1 a.m. E. S. T. October 31, 1955. This directive will, of course, be backed by the full power of the court. However, it will be most effective if both parties accept it with the firm resolve to carry out its provisions in complete good faith. This good faith requires on the part of the union and its representatives a firm resolve to picket peaceably and to allow in reality free access to plaintiff's property.

It requires on the part of the company and its representatives, recognition of the workers' right to participate in a strike without personal humiliation or embarrassment.

RODGERS, P. J., December 10, 1955.—On October 26, 1955, plaintiff, Westinghouse Electric Corporation, filed a bill of complaint against above named defendants seeking a temporary restraining order against alleged unlawful picketing being conducted by defendants at the plants of plaintiff located in the City of Sharon and in Pymatuning Township, both in Mercer County. Plaintiff's complaint alleged that defendants had forcibly denied plaintiff access to these plants. The complaint was brought under the 1939 amendment to the Pennsylvania Labor Anti-Injunction Act which restored to the court of common pleas the equitable powers exercised by them prior to the Act of 1937.

A hearing was heard on the matter and the court found as a fact:

"1. That the defendant has denied the plaintiff the right to access to its property by the use of force or the threat of force."

The court then issued a temporary restraining order which provided inter alia:

"4. If the defendants or any of them shall choose to *picket or remain near any entrance to the property of the plaintiff*, such pickets shall refrain from mass picketing or in any other manner interfering with persons using the entrances or exits and shall conduct themselves in such manner as not to block the use of the said entrances or ingress or egress of any party desiring to enter the same."

On December 6, 1955, plaintiff moved the court to amend its order of October 28, 1955, so as to limit the number and extent of such picketing and to spell out in more detail the prohibition against remaining "near any entrance to the property of the plaintiff".

The court set the matter down for hearing on December 8, 1955. At that time counsel for defendant contended that the original temporary injunction had expired under the provisions of the Labor Anti-Injunction Act of June 2, 1937, P. L. 1198, sec. 16, as amended by the Act of June 9, 1939, P. L. 302 and referred to section 16 of this act which provided: "Every temporary injunction . . . issued in a case involving . . . a labor dispute shall, by its terms, expire within such time after entry as the court may fix, not to exceed ten (10) days, unless the plaintiff is ready by the expiration of such period to proceed to trial, and shall pay the necessary calendar and trial fees".

The court ruled that section 16 above quoted had no application to the order in question which had been entered under the broad equitable powers of the com-

mon pleas court, unrestricted by the Labor Anti-Injunction Act as amended.

This was a specific holding of Carnegie-Illinois Steel Corp. v. United Steel Workers of America, C.I.O., 353 Pa. 420, 428. See also, Westinghouse Elec. Corp. v. United Electrical Workers, 353 Pa. 446, 454-456.

Hearing was then held on plaintiff's motion to amend and the testimony clearly disclosed a specific violation of the terms of the original restraining order. Most of the violations testified to occurred between 11 and 12 p.m. on December 4th and between 6:30 and 8:30 a.m. on December 5th. These times covered the hours during which the mass of Westinghouse employes would ordinarily enter the gates for work. Pictures taken between 7 and 8 a.m. on December 5th disclosed activity which was mass picketing under any conceivable definition of that term. Plaintiff's exhibit G depicts a picket line numbering hundreds, in operation in front of two of the company's gates. One witness testified that at 7 a.m., there were approximately 100 pickets in front of the office entrance; others testified that there were 30 or 40 pickets when they appeared at the gate and that the pickets were three or four feet deep immediately in front of the entrance.

The activity of these pickets is described in the testimony of Leonard Saunders, a management employe of Westinghouse, as follows:

"Q. And will you describe what you found when you arrived at the plant; where you arrived, and so forth?

"THE COURT: What time did you say you arrived, sir?

"THE WITNESS: 7:35.

"A. Why, at that time, I approached the office entrance from the north. That was on Sharpsville Avenue. As soon as I arrived, I could see there was a large congregation of people on the east side—several hun-

dred men and some women—Westinghouse employes and, I think, some spectators. In the street itself, there was a large circle of pickets, three or four deep, marching within a foot or two of each other. They were marching counter-clockwise, going north on Sharpsville, across the street, and proceeding south towards the main employes' factory entrance. On the sidewalk there were, probably between forty and fifty pickets in the immediate vicinity of the office entrance. And I approached the entrance, there was one line—a single file—of office people entering the plant one at a time. I had to leave the sidewalk, go on to the street, and then approach the entrance. As I did so, pickets immediately closed ranks. They were five or six deep at that time, making it absolutely impossible for anyone to enter unless those pickets so desired. I approached the ranks and asked permission to enter; first, by two or three pickets, the answer was no. Then other pickets said it would be necessary that I show my pass. I told them that was not a requirement; that I had every right to enter the plant. I was told repeatedly to show my pass. I then stated, 'I do not have a pass.' This discussion took probably a minute, a minute and a half. At that time one of the officers of the Union approached this group from the south, and he addressed the pickets and made this statement: That I was only there to make trouble for them; to let me enter. They did not do so immediately, and he repeated the request and I was allowed to enter."

John Hunter Childs, Jr., another management employe, testified as follows:

"Q. Will you relate to the court the situation you found and the experience you had Monday morning?

"A. The street was completely blocked and the policemen were directing traffic northward on Sharpsville, and my car turned to the right and I got out on the north side of Hull Street, facing on to Sharpsville

Avenue. At that time I observed something well over five hundred people on the east side of the street—quite a number I recognized as Westinghouse people, apparently, ready to go to work. On the right side of the street, there were—I would say well above that number of people spread out all along the street from as far as I could see down. That is, the Police entrance on up to the Hull Street entrance. About ten minutes to eight, I went across the street to go in. At that time, there was a mass of pickets and people with placards from other Unions than the Local Union involved in this thing. I would say, in a radius of 25 feet from the center of that door, there was something over a hundred people massed in that area, just standing there; not marching around; in fact, blocking the entrance. It was possible to go on the south side of the rail which extends out along the street there for about twenty-odd feet, on the south side, to start through the heavy group of pickets. I got in some ten feet, and about five feet from the door, when my entrance was blocked—a number of people gathered around so tightly it would have been impossible to get through. Ahead of me about five feet I saw Mr. Gillette—who, I am sure, recognized me from previous times—previously being in court. But they claimed they did not know me and weren't going to let me in unless I showed my pass. I felt that I had no reason to show pass; . . . about that time, Skinny Bell came up and said: 'All this fellow wants to do is get testimony that he can't get into the Works; we'll fix him by just taking him in.' I said, 'No, I'm not trying to get that testimony; I have already made a diligent effort to get in, and without forcing, I couldn't get in, and there is no reason for Management to start force on this.' He said: 'Well, I'll open up the picket line and see you in.' I said: 'You don't have to open up the picket line and see me in; if you'll

just open it up, I'll walk in, but if you want to go in with me, it's perfectly all right'."

On cross-examination Mr. Childs testified as follows concerning his conversation with a Mr. Phillips who described himself as an international representative of the union and Mr. Bell, one of the defendants in this case:

"Q. And then what did you do after you talked to the Mayor?

"A. Mr. Phillips came up and started berating me for not showing my pass and not coöperating, and Mr. Bell came up.

"Q. Instead of saying Mr. Phillips started berating you, will you tell us exactly what Mr. Phillips said to you and what you said to him?

"A. I don't know if I can tell you, exactly.

"Q. Tell us the nature of the conversation.

"A. Yes. He said that Mr. Saunders had showed his pass to get in and he didn't know why I felt I was so much better than he was; that I wouldn't show my pass. I told him I didn't have any reason to show my pass. I didn't normally show my pass to people to get into work; that I had a right to get in and would like to go in. He said all I was trying to do was make trouble, and I said: 'No, I'm not trying to make trouble; all I am trying to do is get into the Works and I made no trouble whatsoever.'

"Q. Did you know Mr. Phillips before that day?

"A. Yes, I knew him.

"Q. Isn't it true that other men were getting in while you were standing there arguing with the pickets?

"A. Yes, if they would show, they would move in. They would open the line on the other side of me and move in.

"Q. How many men did you see show their pass?

"A. I suppose, while I was standing there, twenty or thirty.

"Q. How many went in while you were standing there?

"A. All of those went in, except two or three supervisors who would not show their pass. They did not get in.

"Q. How many went in altogether during the twelve minutes while you were out there?

"A. I don't know. There must have been quite a few.

"Q. And you saw about twenty or thirty show their pass?

"A. Yes, that's correct, while I was in the midst of this group."

In addition to those unquestionably acting as pickets, there was a revolving band of from 400 to 1000 union members, variously described by officers of the union as a picket line, a show of strength and a rally, operating in front of plaintiff's gates.

The photographic exhibits show these men to be formed in an irregular column of threes moving at a close route order in the nature of a slow moving army mess line. Under the circumstances of this case, however, it could certainly be called nothing but a picket line. The union president, in addressing his union at the time of the incident, called it just that. Further, it is certainly mass picketing in every sense of the word and as Mr. Justice Bell said in Wortex Mills, Inc. v. Textile Workers Union, 380 Pa. 3, 7:

"The Supreme Court of the United States and this Court have repeatedly reiterated that *mass picketing is illegal* and that *State Courts have power to restrain such picketing.*"

Defendants contend that even though these things were to be considered, it was still perfectly possible for anyone to enter the plant if he so desired. The evidence is to the contrary. Even though the testimony of Rev.

Rader was obviously that of a bitterly partisan witness, it was nevertheless believable, and he testified that the pickets in his presence specifically refused admission to one workman. This testimony is corroborated by that of Saunders and Childs which referred to the requiring of passes. This practice was specifically declared to be illegal in Westinghouse Electric v. United Electrical Workers, 353 Pa. 446.

We are aware that there is testimony from creditable witnesses for defendant that in their opinion persons could have entered the Westinghouse plant on Monday morning if they had wanted to do so. We recall their testimony that the picket lines were orderly and that there was no violence.

The court has particular reference to the testimony of the county detective and the Mayor of the City of Sharon. We believe that they gave their honest and full opinion on the situation.

Nevertheless, several points must be made:

(1) These men did not have to enter the plant.

(2) Where there is picketing of the nature found here our Supreme Court has specifically ruled that no person need even make an attempt to enter in the face of such potential danger.

(3) The mere presence of the pickets in the numbers found here is in itself an intimidating force which under the law is illegal.

(4) It is certainly a fact that while it may have been possible for those whom the union wanted to enter the plant to enter, it is also true that in view of the testimony in this case these avenues of ingress were very quickly closed whenever the union desired them to be closed.

Actually, however, this court has already discussed these features of the matter in our previous order in which we declared such matters to be illegal and restrained defendants from continuing such practices.

It appears, however, that our order in that case must have been lacking in preciseness. Perhaps it is susceptible to the type of criticism described in the dissenting opinion of Mr. Justice Musmanno in the Westinghouse Electric Corporation v. United Electrical Workers at 383 Pa. 297, 310, 311, wherein he describes such an order as follows:

". . . it does not define mass picketing. While this term has taken on a certain meaning in recent years, it naturally varies according to the factors involved. . . . A loosely drawn injunction to cover this vast domain can lead only to confusion, misunderstanding, and potential discord."

Obviously, the union must have misunderstood our original order. Otherwise, they would certainly be considered in contempt of court. To remedy this situation this court will, therefore, enter a more specific order, specifying the number of pickets and describing in some detail the manner in which they are to operate.

Another problem arises in this case. The business agent of the union, whose testimony was corroborated by the president of the union, testified that from 8 to 12 pickets were regularly assigned to duty at the 26-foot main gate. However, there were within the immediate vicinity hundreds of others whom he described as being participants in a rally of those interested in showing their loyalty to the union. It is perfectly obvious to anyone that this does not tell the whole story, for in addition to the intimidating influence of their very presence, they provide an immediately available reserve force for use in augmenting those on active duty if those forbidden to enter attempt to do so: Westinghouse Electric v. United Electrical Workers, 353 Pa. 446, 453.

In his impassioned plea to this court, counsel for defendants urged that any problems here involved had

been provoked by the company in their effort to "break the morale of the men and the union itself".

The court listened with great care for any testimony of any illegal conduct on the part of the company. None was offered by defendants. We must conclude, therefore, for the purpose of this case, that however else it may be described, the company conduct cannot be said to be illegal. It follows that this court, as such, can take no position with reference to the activities of either the company or the union in the conduct of this strike so long as they conduct a legal strike. As the Supreme Court of Pennsylvania said in the Westinghouse Electric Corporation v. United Electrical Workers, supra.

"[The] court should have been concerned exclusively with the legal question of whether mass picketing, unaccompanied by violence, threats and intimidation, is illegal. Where such action is adjudged illegal, the good or bad motive of an employer in insisting upon the enforcement of the legal principle is immaterial."

This court is bound to follow this pronouncement by the Supreme Court of this Commonwealth.

Counsel for defendants also urged very strongly that any action by the court in amending its original order would be in effect giving support to plaintiff in their economic dispute with defendant.

We would say that the court's only concern in this matter is the enforcement of the law as laid down by the Constitution and the appellate courts.

We believe very strongly that in matters such as these the parties can best handle their own affairs without interference or gratuitous advice from those not involved who more often than not have little or no knowledge of the actual issues involved.

With those policies in mind this court will proceed now, as in the past, to make effective its understanding of the law. We still believe that this union sincerely

desires to abide by the law, and the orders of this court. In order to prevent any misunderstanding in which the standing of this union might be prejudiced, and to eliminate the potential of disorder and violence which now exists, we feel that it is necessary to prevent any confusion between those on picket duty and those participating in a rally or other gathering. For that reason the court will set out certain conditions to be followed with reference to rallies in the vicinity of the struck plant.

We, therefore, enter the following

### Order

And now, December 10, 1955, this cause came on to be heard before the court on motion of plaintiff and the court, being fully advised in the premises, hereby amends the injunctive order issued by this court on October 28, 1955, in the above captioned case by deleting therefrom the paragraph numbered 4 and inserting in its place the following:

4. a. If defendants or any person acting with them or in their behalf shall choose to picket or remain near any entrance to the properties of the plaintiff at its Sharon Works:

(1) The total number of pickets at any one entrance at any one time shall not exceed 12.

(2) Such pickets shall not enter upon any property of plaintiff, but shall remain at least five feet from any wall, gateway, stair, steps, doorway or any other entrance leading to or upon plaintiff's properties.

(3) Such pickets shall keep in motion spaced not less than seven feet apart.

(4) Such pickets shall not in any manner block or impede any of said entrances by the use of automobiles, barricades or other means, but they shall permit the free and unrestricted access of any person or vehicle desiring to enter said properties.

b. Aside from the pickets permitted by this order, none of the defendants, their officers, agents, members or persons acting with them or in their behalf shall congregate or gather in groups for the purpose of meetings, rallies or a show of strength at any place nearer than 150 feet from plaintiff's property known as the Sharon Works of plaintiff at Sharon or Pymatuning Township, Mercer County.

This order shall become effective at 2 p.m., Saturday, December 10, 1955.

RODGERS, P. J., February 13, 1956.—On October 28, 1955, this court entered a temporary restraining order against Local 617, International Union of Electrical, Radio and Machine Workers (CIO), certain officers of that union and the Westinghouse Electric Corporation, enjoining the parties from acts of violence or intimidation and enjoining any interference with the ingress or egress to the properties of Westinghouse Electric Corporation.

Defendant union was then and is now on strike against Westinghouse. Subsequently, a more specific injunction order was issued, specifying the number of pickets and their manner of operation.

On December 23, 1955, Westinghouse petitioned this court for a rule to show cause why defendant union and one Walter Phillips should not be held in contempt of court and set out four instances of alleged contempt on the part of the union and ten instances of contempt on the part of Phillips.

On December 28, 1955, this petition to show cause was amended by adding one additional count of alleged contempt on the part of both Phillips and the union. The court issued a rule to show cause on both the union and Phillips, and made both the original and amended rule returnable the 30th day of December, 1955. Argument was set for January 5, 1956.

On December 30, 1955, B. H. Marks entered his appearance specially for Walter Phillips to question the jurisdiction of the court over the said Phillips. At the same time counsel filed a notice that if and when the above entitled matter should be ready for trial, both the union and Phillips requested a jury trial in accordance with the Act of June 23, 1931, P. L. 925, sec. 1.

On the same date counsel filed preliminary objections to the petition with reference to the union, alleging first that the court was without jurisdiction as to Phillips because he had not been served with the rule, and second, that the court was without jurisdiction over either Phillips or the union because the temporary injunction entered in the matter had expired 10 days after its issuance in accordance with the Labor Anti-Injunction Act of June 2, 1937, P. L. 1198, section 4, as amended by the Act of June 9, 1939, P. L. 302, and by virtue of section 16 of the said act.

In addition, there are 18 objections to specific paragraphs of the petition on the grounds that the petition fails to allege specifically material facts which defendants are able to answer.

The court will first consider counsel's contention that the original injunction has expired under the provisions of the Labor Anti-Injunction Act of June 2, 1937, as amended by the Act of 1939, P. L. 302 and referred to section 16 of this act which provides:

"Every temporary injunction . . . issued in a case involving . . . a labor dispute shall, by its terms, expire within such time after entry as the Court may fix, not to exceed ten (10) days, unless the plaintiff is ready by the expiration of such period to proceed to trial and shall pay the necessary calendar and trial fees."

This court has ruled that section 16, above, does not apply to our situation and that the original temporary injunction is still in force. The basis of this opinion is, of course, the specific language of the Amending Act

of 1939 which after setting out certain restrictions on the court's jurisdiction, states, section 4:

"This Act shall not apply in any case— . . . (d) where in the course of a labor dispute . . . members . . . of a labor organization . . . seize . . . property of the employer."

It is clear that the type of picketing employed by the union in this case is a seizure of the property of petitioners under the holding of Westinghouse Electric v. United Electrical Workers, 353 Pa. 446. It follows that if the act on which defendants rely does not apply, the court may then exercise all traditional, equitable powers. This was the specific holding of Carnegie-Illinois Steel Corp. v. United Steel Workers of America, 353 Pa. 420, 428, where Chief Justice Maxey's opinion stated:

"The Act of June 9, 1939, P. L. 302, 43 PS 206d, amending the Anti-Injunction Act of 1937 . . . completely restores to the court of common pleas the powers exercised by them since the Act of June 16, 1836 . . . for causes which fall within the terms of the 1939 Amending Act."

We, therefore, reaffirm our opinion that the original temporary injunction is still in force.

We now come to the question of the court's jurisdiction over Walter Phillips. Phillips was not a defendant in the original action, although he appeared therein as a witness and was served with a copy of the court's injunction. He has not been served with the petition for a rule to show cause. The entry of an appearance for him by counsel was for the specific purpose of contesting the jurisdiction of the court. This is made clear both in the entry of appearance and in the conditional notice of a request for jury trial which was signed by B. H. Marks as attorney for defendants, "specially for Walter Phillips".

Plaintiff, however, quotes the Restatement, Judg-

ments, §19, Comment (c) (1942): "If the defendant wishes to raise the question of jurisdiction, it is necessary for him to appear solely for that purpose", and then contends: "It is clear that Phillips appeared generally by demanding a jury trial in the contempt proceedings". We cannot agree. The notice in question reads as follows:

"Notice is hereby given that *if and when* the above entitled matter pertaining to the petition for rule to show cause be ready for trial, the defendants request a jury trial. . . . Signed, B. H. Marks, Attorney for Defendants, Specially for Walter Phillips." (Italics supplied.)

While such a notice may bring defendant, Walter Phillips, dangerously close to the jurisdictional line, we believe that it must be read in conjunction with his very specific special appearance filed at the same time contesting the jurisdiction of the court.

Phillips does not now ask for a jury trial. He merely asks that, if and when the case is ready for trial, he be granted a jury trial. The case cannot be ready for trial until the jurisdictional question has been answered. We believe, therefore, that the conditional request for a jury trial does not give this court jurisdiction over Phillips.

Plaintiff further contends that the entry of any appearance by counsel for Phillips indicates his knowledge of the petition for a rule and that this knowledge gives this court jurisdiction over his person because of Phillips previous connection with the original injunction action.

We do not believe this to be the law. A contempt proceeding is separate and distinct action and is not a part of the original injunctive action. This is an indirect criminal contempt action, and the court's jurisdiction must stand on whatever service we may have in that action.

This is clearly within the holding of the Supreme Court of Pennsylvania in Penn Anthracite Mining Company v. Anthracite Miners of Pennsylvania, 318 Pa. 401, 412, and of the Superior Court in the same matter at 114 Pa. Superior Ct. 7 at 20, where the Superior Court referred to the contempt action as "an independent proceeding at law for a criminal contempt which is also a crime". The court said further:

"The proceeding is not between the parties to the original suit but between the public and the defendant. The only substantial difference between such a proceeding as we have here, and a criminal prosecution by indictment or information is that in the latter the act complained of is the violation of a decree."

Certainly it could not be claimed that the court would have any jurisdiction over defendant Phillips on the basis of what has been done to date if this were a criminal action and we do not believe that we have any jurisdiction over him in this action.

Westinghouse also contests the right of the union to a jury trial under the Act of June 23, 1931, P. L. 925. The relevant sections of the statute read as follows:

"In all cases where a person shall be charged with indirect criminal contempt for violation of a restraining order or injunction issued by a court . . . the accused shall enjoy—

"A. The rights as to admission of bail that are accorded to persons accused of crime.

"B. The right to be notified of the accusation and a reasonable time to make a defense. . . .

"C. Upon demand, the right to a speedy and public trial by an impartial jury. . . .

"Punishment for a contempt specified in section one may be by fine not exceeding one hundred dollars, or by imprisonment not exceeding fifteen days in jail of the county where the court is sitting, or both, in the discretion of the court. Where a person is committed to

jail for the non-payment of such a fine, he must be discharged at the expiration of fifteen days, but where he is also committed for a definite time, the fifteen days must be computed from the expiration of the definite time."

Westinghouse contends that a reading of this statute in its entirety indicates that its provisions apply only to natural persons and not to unincorporated associations such as the union.

Section 1(a) of the Act of 1931 states that persons accused of an indirect criminal contempt shall enjoy "The rights as to admission to bail that are accorded to persons accused of crime". Obviously, "persons" within the meaning of this subsection must mean "natural person" since associations and corporations are not in the ordinary sense ever taken into custody and hence are never admitted into bail. In the punishment section of the act, the maximum punishments are set forth as $100 fine or imprisonment or both at the discretion of the court. The act then states that: "Where a person is committed to jail for nonpayment of such a fine, he must be discharged at the expiration of fifteen days". Again the legislature must have been referring to a natural person for the same reason as that indicated above.

However, there are other sections of the act such as punishment by fine, the right to be notified and the right to a jury trial which could very well apply to both natural persons and to groups of persons or associations. It is this court's opinion that the fact that certain of the rights granted cannot be exercised by all those covered by the statute, is not sufficient to deny those persons or groups of persons the rights which they are able to exercise.

Counsel for defendant union contends that the Penn Anthracite case controls the present matter. That case upheld the constitutionality of the Act of June 23,

1931, P. L. 925, which granted a jury trial to persons charged with an indirect criminal contempt.

The union's argument is based on the language of the Superior and Supreme Courts which indicates that appellants in the contempt proceeding included all of the parties to the original injunctive action, including the union. It is certainly true that the union was a party to the original action in the Anthracite case and that the captions would indicate that the union was an appellant and further that the Supreme Court intended its language to apply to all of the appellants. An examination, however, of the dockets of the Common Pleas Court of Lackawanna County shows that the court did not find the union guilty of contempt and made no decree against them. In fact the order of the lower court is as follows:

"AND NOW, February 2, 1934, you, Walter Donorovitch, Ed Wesulavich, Casper Biancit, William Suwak, Joe Hildago, Mike Copas, Bartoli Casselli, Sam Castiego, John Bobosloski, Andrew Metala, Mike Chupak and John Mashie, and each of you have been adjudged guilty of contemptuous violation of an order of this court, to-wit, an injunction restraining you from further acts of violence and intimidation to the prejudice of the plaintiff's mining operation and for that offense you and each of you are ordered to pay a fine of $50.00 to be collected by the Sheriff and you stand committed in his custody until the order is complied with.

"By the Court"

This being true, the rights of the union as such were not at issue and the Anthracite case does not control us here. It is helpful only so far as its language tends to enlighten us on the court's attitude towards the legislation generally.

The word person has been said to be a "broad and ambiguous word, in legal usage a generic term, and

by itself it is an equivocal word requiring interpretation. Like many other words, it has no fixed and rigid signification; it has many different meanings dependent on contemporary conditions, the connection in which it is used and the result intended to be accomplished, and the sense in which it is used in any particular instance may often be ascertained from the context and intent with which it is employed": 70 C. J. S. 686.

The Supreme Court of Pennsylvania at 318 Pa. 401, in the Penn Anthracite case, indicated what it believed the intent of the statute to be by setting out in Chief Justice Maxey's concurring opinion a stirring tribute to the jury system generally and to its place in the jurisprudence of this Commonwealth, specifically stating: "Trial by jury is the corner-stone of our administration of justice. Though imperfect, like all other human institutions, it has stood the test of time": page 419. And: " 'It is the best method yet devised for the determination of disputed questions of fact in the administration of justice' ": page 420. And more specifically, at page 422, Chief Justice Maxey said: "No human being is ever benign enough to be entrusted with absolute power. Unless we have a jury trial in these contempt cases, *one individual* acts as lawyer, judge, *and* jury." These comments apply as forcefully to a group of persons such as a union as they do to an individual.

In Busser v. Snyder, 282 Pa. 440 at 451, the Supreme Court was considering the constitutionality of an old age assistance act within the intent and meaning of section 18, article 3 of the Constitution, prohibiting appropriations "to any person or community", etc. The Supreme Court said:

"Appellant further argues that the phrase 'to any person or community,' has a restricted meaning, and it is on these words the Commonwealth chiefly relies

to sustain the Act. In effect, appellant would have 'person' used in an individual rather than a collective sense,—certainly not broad enough to include the government acting in an administrative capacity, functioning through an agency, to work out governmental policies. . . . This contention is not sound; 'person' and 'community' are not limited to the idea of a single person or place where persons are located; they are used in an inclusive sense, relating to an individual or a group or class of persons, wherever situate, in any part or all of the Commonwealth. It applies to persons, kind, class and place, without qualification. The language of the Constitution is an absolute and general prohibition nor does the fact that the appropriation is made to an agency . . . aid appellant's case. The gift is not to the commission, but to the particular persons selected by the legislature to receive it. The commission cannot use the money; it merely passes it on to the selected class. It is nonetheless a gift directly to the individual, even though it pauses for a moment on its way thither in the hands of the agency."

Our case is analagous. While the injunction or the rule is directed to the union, its impact is directly upon the persons or members of that union. The Busser case also gives some support to the union argument that the statute is for the protection of "persons", that the union is made up of persons and that, therefore, the union is protected by its provisions. Although the argument has obvious weaknesses, it does, when considered with the language of the Supreme Court in the Anthracite and Busser cases, the spirit and intent of the statute in question, and the strong Anglo-American tradition in favor of the jury trial, lead this court to concur with the union's position. See also, Fulham's Estate, 96 Vt. 308, 119 Atl. 433, where, under a taxing statute, the court held the word "person" to include a college. The court said:

". . : the real meaning and purpose of the law giver is the thing to be sought after, and if fair and reasonable construction discloses it, it is to be given effect."

In Simms v. University Inter-Scholastic League, (Tex. App.) 111 S. W. 2d 814, at 820, the court ruled on a dispute between a committee and an association and held that the committee was persons who could be subject to the jurisdiction of the court under their statute; Clay, Robinson and Co. v. Douglas County, 88 Neb. 363, 129 N. W. 548, where in another case under a taxation statute, a partnership was by judicial determination declared to be within the meaning of the word "persons"; and Words and Phrases, volume 32, page 338, indicating that in a majority of the jurisdictions, a person under a criminal statute includes individuals, associations and corporate bodies. To the same effect see, State v. Wilkerson, 98 N. C. 696, 3 S. E. 683, 686.

We, therefore, conclude that the union has a right to a jury trial in the present action.

Without setting out in detail the deficiencies in each of plaintiff's allegations of a contempt on the part of Phillips or the union, the court believes that they do fail to allege specifically sufficient material facts to permit defendant to prepare an answer. In many instances the allegation fails to state where the alleged offense occurred.

Paragraph 7(b) fails to indicate the date on which the alleged offense occurred, although it might be assumed that the offense occurred on December 10, 1955.

Plaintiff has in many instances used the word assault or assaulted. The court feels that defendant has the right to know prior to trial whether the alleged offense includes actual physical touching or mere threats.

*Order*

And now, February 3, 1956, the rule to show cause granted on Walter Phillips is discharged for the reason that Walter Phillips has not been served with the petition for a rule to show cause. The motion of defendant union that the petition for a rule to show cause against the union be discharged for the reason that the court is without jurisdiction, is denied.

Plaintiff petitioner is directed to amend its petition within 10 days to conform with this opinion and defendant is granted 10 days after the filing of the amended petition to answer the same.